854 P.2d 1134

**Bobby Sid TAYLOR, Plaintiff–Appellant, Cross–Appellee,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois corporation, Defendant–Appellee, Cross–Appellant.**

**No. CV–91–0411–PR.**

Supreme Court of Arizona,
En Banc.

June 10, 1993.

Thur, Dawson & O'Sullivan by Calvin C. Thur, Steven C. Dawson, Scottsdale, and Mark Stachon and William S. Andrews, Phoenix, for Bobby Sid Taylor.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Ralph E. Hunsaker and Lisa M. Sommer, Phoenix, for State Farm Mut. Auto. Ins. Co.

Treon, Strick, Lucia & Aguirre by Richard T. Treon and Arthur G. Newman, Jr., Phoenix, for James Rivers, amicus curiae.

## OPINION

Memorandum Decision of the Court of Appeals, Division One, filed September 17, 1991, vacated and remanded

FELDMAN, Chief Justice.

Bobby Sid Taylor petitions us to review a decision reversing a jury verdict in his fa-

vor in a bad faith claim against State Farm Mutual Automobile Insurance Co. He argues that the court of appeals erroneously held that his bad faith claim was barred by a release he signed in 1981. We granted review because the case raises important issues in the area of contract and insurance law. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3), and Ariz.R.Civ. App.P. 23.

## FACTS AND PROCEDURAL HISTORY

This insurance bad faith action arises out of an accident that occurred approximately sixteen years ago. Many of the facts are undisputed. The accident involved three vehicles—one occupied by Anne Ring and passenger James Rivers, the second by Douglas Wistrom, and the third by Bobby Sid Taylor. Ring, Rivers, and Taylor all were injured. The facts surrounding the accident are set forth in *Ring v. Taylor*, 141 Ariz. 56, 59, 685 P.2d 121, 124 (Ct.App. 1984). Ring, her husband, and Rivers filed actions against Taylor and Wistrom. These actions were consolidated before trial. Taylor's insurer, State Farm, retained attorney Leroy W. Hofmann to defend Taylor. Taylor also personally retained attorney Norman Bruce Randall, who filed a counterclaim against Ring for Taylor's damages. Taylor, therefore, was represented by both Randall and Hofmann in the matter. Because the Rings and Rivers agreed with Wistrom to a stipulated judgment and covenant not to execute, Taylor was the only party vulnerable to the Ring/Rivers claims. At trial, the Rings and Rivers obtained combined verdicts against Taylor for approximately $2.5 million in excess of his insurance policy limits. The court of appeals affirmed these judgments. *Taylor*, 141 Ariz. at 59, 71, 685 P.2d at 124, 136.

The Rings eventually settled with State Farm. Taylor, however, sued State Farm for bad faith seeking damages for the excess Rivers judgment, claiming, among other things, that State Farm improperly

failed to settle the Rivers matter within policy limits. State Farm moved for summary judgment, asserting that Taylor relinquished his bad faith claim when, in 1981, he signed a release drafted by attorney Randall in exchange for State Farm's payment of $15,000 in uninsured motorist benefits.[1] Taylor also moved for partial summary judgment, seeking a ruling that, as a matter of law, the release did not preclude his bad faith claim. The judge denied both motions, finding that the release was ambiguous and that therefore parol evidence was admissible at trial to aid in interpreting the release. A second judge, who presided at trial, also denied State Farm's motion for directed verdict based on the release. Having been instructed on the interpretation of the release, the jury returned a verdict in favor of Taylor for compensatory damages of $2.1 million. The court also awarded Taylor $300,000 in attorney fees.

The court of appeals reversed, holding that the release agreement was not ambiguous and therefore the judge erred by admitting parol evidence to vary its terms. *Taylor v. State Farm Mut. Auto. Ins. Co.*, No. 1 CA–CV 9908 (Sep. 17, 1991) (mem. dec.). Based on the agreement's "four corners," the court held that "it clearly release[d] all policy contract rights, claims, and causes of action that Taylor has or may have against State Farm." *Id.* at 20. According to the court, because the release should have been strictly enforced, there was no basis for Taylor's bad faith claim. *Id.* We believe the court's decision both incorrectly applies settled legal principles and raises unsettled issues of contract interpretation.

## DISCUSSION

Much of the dispute in this case centers on the events that surround the drafting of the release and the inferences that can be drawn from those events. As noted, the trial court found that the release was am-

---

1. Because Wistrom was uninsured, Randall believed that Taylor might be entitled to recover for his injuries under the uninsured motorist provisions of Taylor's policy. State Farm, however, disputes Taylor's entitlement to these bene-

fits. In any event, Randall prepared a release as part of the transaction. It is this release that is at issue. The extent of State Farm's participation in its drafting is disputed.

biguous and admitted extrinsic evidence to aid in its interpretation. The court of appeals found no ambiguity. *Taylor*, mem. dec. at 20, 23. In resolving this issue, we must address the scope and application of the parol evidence rule in Arizona and decide whether, under these facts, the trial court properly admitted extrinsic evidence to interpret the release.

**A. Legal principles**

■ The application of the parol evidence rule has been the subject of much controversy and scholarly debate. *See generally Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 392–93, 682 P.2d 388, 397–98 (1984); John D. Calamari & Joseph M. Perillo, THE LAW OF CONTRACTS §§ 3–2 to 3–16, at 135–77 (3d ed. 1987); Robert L. Gottsfield, Darner Motor Sales v. Universal Underwriters: *Corbin, Williston and the Continued Viability of the Parol Evidence Rule in Arizona*, 25 ARIZ.ST.L.J. 377 (1993). "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." 3 Arthur L. Corbin, CORBIN ON CONTRACTS § 573, at 357 (1960) ("CORBIN"); *see also Rental Dev. Corp. v. Rubenstein Const. Co.*, 96 Ariz. 133, 136, 393 P.2d 144, 146 (1964) (citing CORBIN). Antecedent understandings and negotiations may be admissible, however, for purposes other than varying or contradicting a final agreement. 3 CORBIN § 576, at 384. Interpretation is one such purpose. 3 CORBIN § 579, at 412–13; Restatement (Second) of Contracts § 214(c) & cmt. b (1979) ("Restatement").

■ Interpretation is the process by which we determine the meaning of words in a contract. *See* Restatement § 200. Generally, and in Arizona, a court will attempt to enforce a contract according to the parties' intent. *See Darner*, 140 Ariz. at 393, 682 P.2d at 398; *Polk v. Koerner*, 111 Ariz. 493, 495, 533 P.2d 660, 662 (1975);

*Sam Levitz Furniture Co. v. Safeway Stores, Inc.*, 105 Ariz. 329, 330–31, 464 P.2d 612, 613–14 (1970). "The primary and ultimate purpose of interpretation" is to discover that intent and to make it effective. 3 CORBIN § 572B, at 421 (1992 Supp.). The court must decide what evidence, other than the writing, is admissible in the interpretation process, bearing in mind that the parol evidence rule prohibits extrinsic evidence to vary or contradict, but not to interpret, the agreement. *See* 3 CORBIN § 543, at 130–34. These substantive principles are clear, but their application has been troublesome.

**1. *Restrictive view***

■ Under the restrictive "plain meaning" view of the parol evidence rule, evidence of prior negotiations may be used for interpretation only upon a finding that some language in the contract is unclear, ambiguous, or vague. E. Allan Farnsworth, FARNSWORTH ON CONTRACTS § 7.12, at 270 (1990) ("FARNSWORTH"). Under this approach, "if a writing, or the term in question, appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." Calamari & Perillo, *supra* § 3–10, at 166–67; *cf.* Gottsfield, *supra*, at 388–89. Thus, if the judge finds from the face of a document that it conveys only one meaning, parol evidence is neither considered nor admitted for any purpose. The danger here, of course, is that what appears plain and clear to one judge may not be so plain to another (as in this case), and the judge's decision, uninformed by context, may not reflect the intent of the parties.

**2. *Corbin view***

■ Under the view embraced by Professor Corbin and the Second Restatement, there is no need to make a preliminary finding of ambiguity before the *judge considers* extrinsic evidence. 3 CORBIN § 542, at 100–05 (1992 Supp.); Restatement § 212 cmt. b; FARNSWORTH § 7.12, at 272; Gottsfield, *supra*, at 384. Instead, the

court considers all of the proffered evidence to determine its relevance to the parties' intent and then applies the parol evidence rule to exclude from the fact finder's consideration only the evidence that contradicts or varies the meaning of the agreement. 3 CORBIN § 542, at 100–01 (1992 Supp.). According to Corbin, the court cannot apply the parol evidence rule without first understanding the meaning the parties intended to give the agreement. *Id.* To understand the agreement, the judge cannot be restricted to the four corners of the document. Again, even under the Corbin view, the court can admit evidence for *interpretation* but must stop short of *contradiction*. *See* 3 CORBIN § 574, at 371–72; Gottsfield, *supra,* at 386–87, 392.

### 3. *Arizona view*

Writing for a unanimous court in *Smith v. Melson, Inc.*, 135 Ariz. 119, 121–22, 659 P.2d 1264, 1266–67 (1983), Chief Justice Holohan expressly committed Arizona to the Corbin view of contract interpretation. *Burkons v. Ticor Title Ins. Co. of Cal.*, 168 Ariz. 345, 350–51, 813 P.2d 710, 715–16 (1991); *see also Darner,* 140 Ariz. at 393, 682 P.2d at 398; *cf.* Gottsfield, *supra,* at 389–90 & n. 83 (citing numerous cases decided before *Melson*). We have not, however, fully explored *Melson*'s application. *See* Gottsfield, *supra,* at 378. We have held that a court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct, but have not elaborated much further. *Darner,* 140 Ariz. at 393, 682 P.2d at 398; *see also Burkons,* 168 Ariz. at 351, 813 P.2d at 716; *Melson,* 135 Ariz. at 122, 659 P.2d at 1267.

According to Corbin, the proper analysis has two steps. First, the court *considers* the evidence that is alleged to determine the extent of integration, illuminate the meaning of the contract language, or demonstrate the parties' intent. *See* 3 CORBIN § 542, at 100–01 (1992 Supp.). The court's function at this stage is to eliminate the evidence that has no probative value in determining the parties' intent. *Id.* The second step involves "finalizing" the court's understanding of the contract. *Id.* at 100. Here, the parol evidence rule applies and *precludes admission* of the extrinsic evidence that would vary or contradict the meaning of the written words. *Id.*

Even during the first step, the judge may properly decide not to consider certain offered evidence because it does not aid in interpretation but, instead, varies or contradicts the written words. *See id.* at 101. This might occur when the court decides that the asserted meaning of the contract language is so unreasonable or extraordinary that it is improbable that the parties actually subscribed to the interpretation asserted by the proponent of the extrinsic evidence. *See id.* "The more bizarre and unusual an asserted interpretation is, the more convincing must be the testimony that supports it." 3 CORBIN § 579, at 420. At what point a judge stops "listening to testimony that white is black and that a dollar is fifty cents is a matter for sound judicial discretion and common sense." *Id.*

When interpreting a contract, nevertheless, it is fundamental that a court attempt to "ascertain and give effect to the intention of the parties at the time the contract was made if at all possible." *Polk,* 111 Ariz. at 495, 533 P.2d at 662; *see also Darner,* 140 Ariz. at 393, 682 P.2d at 398; *Sam Levitz Furniture Co.,* 105 Ariz. at 330–31, 464 P.2d at 613–14. If, for example, parties use language that is mutually intended to have a special meaning, and that meaning is proved by credible evidence, a court is obligated to enforce the agreement according to the parties' intent, even if the language ordinarily might mean something different. *See* Restatement § 212 cmt. b, illus. 3 & 4. The judge, therefore, must avoid the often irresistible temptation to automatically interpret contract language as he or she would understand the words. This natural tendency is sometimes disguised in the judge's ruling that contract language is "unambiguous." *See* 3 CORBIN § 543A, at 159 (1992 Supp.). Words, however, are seldom so clear that they "apply themselves to the subject matter." Restatement § 214 cmt. b. On occasion, exposition of the evidence regarding

the intention of the parties will illuminate plausible interpretations other than the one that is facially obvious to the judge. *See id.* Thus, ambiguity determined by the judge's view of "clear meaning" is a troublesome concept that often obstructs the court's proper and primary function in this area—to enforce the meaning intended by the contracting parties. *See* 3 CORBIN § 542, at 122–24; Gottsfield, *supra,* at 385.

 Recognizing these problems, we are hesitant to endorse, without explanation, the often repeated and usually oversimplified construct that ambiguity must exist before parol evidence is admissible. We have previously criticized the ambiguity prerequisite in the context of non-negotiated agreements. *See State Farm Mut. Auto. Ins. Co. v. Wilson,* 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989) (recognizing the lack of logic in requiring ambiguity, which may be fortuitous, to prove the true terms of an agreement); *Darner,* 140 Ariz. at 389, 682 P.2d at 394 (same). Moreover, a contract may be susceptible to multiple interpretations and therefore truly ambiguous yet, given the context in which it was negotiated, not susceptible to a clearly contradicting and wholly unpersuasive interpretation asserted by the proponent of extrinsic evidence. In such a case, it seems clear that a court should exclude that evidence as violating the parol evidence rule despite the presence of some contract ambiguity. Finally, and most important, the ambiguity determination distracts the court

from its primary objective—to enforce the contract as intended by the parties. Consequently, although relevant, contract ambiguity is not the only linchpin of a court's decision to admit parol evidence.

 The better rule is that the judge first considers the offered evidence and, if he or she finds that the contract language is "reasonably susceptible" to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties. *See* Restatement § 215 cmt. b; *see also Pacific Gas & Elec. Co. v. G.W. Thomas Dray. & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 564, 566, 567–68, 442 P.2d 641, 644, 645–46 (1968);[2] *cf. Melson,* 135 Ariz. at 121, 659 P.2d at 1266 ("A contract should be read in light of the parties' intentions as reflected by their language and in view of all the circumstances."). The meaning that appears plain and unambiguous on the first reading of a document may not appear nearly so plain once the judge considers the evidence. In such a case, the parol evidence rule is not violated because the evidence is not being offered to contradict or vary the meaning of the agreement. To the contrary, it is being offered to explain what the parties truly may have intended. We believe that this rule embodies the concepts endorsed by Corbin and adopted by this court ten years ago in *Melson.* Other courts more recently have expressed approval of the position taken by Corbin and the Restatement (Second) of Contracts.

**2.** We recognize that *Pacific Gas* has its critics. *See, e.g., Wilson Arlington Co. v. Prudential Ins. Co.,* 912 F.2d 366, 369–70 (9th Cir.1990); *Oki America, Inc. v. Microtech Int'l, Inc.,* 872 F.2d 312, 317 (9th Cir.1989) (Kozinski, J., concurring); *Trident Center v. Connecticut Gen. Life Ins. Co.,* 847 F.2d 564, 568–70 (9th Cir.1988); *cf. Nedlloyd Lines B.V. v. Superior Court,* 3 Cal. 4th 459, 11 Cal.Rptr.2d 330, 337, 834 P.2d 1148, 1155 (1992) (majority declining to extend the rule to choice of law clauses).

We nevertheless believe that the rule correctly embodies the Corbin view adopted in *Melson. See* 3 CORBIN § 542, at 102 (1992 Supp.) (citing *Pacific Gas* as an "excellent example of correct analytical thinking"). We believe that these cases read much more in *Pacific Gas* than is there. We too would recoil if *Pacific Gas* meant that mere complexity required a finding of am-

biguity or that courts must listen to wholly unpersuasive extrinsic evidence to create ambiguity where words are clear beyond dispute. *See Wilson Arlington Co.,* 912 F.2d at 371. What this means, at least in Arizona, is that the parol evidence rule does not apply to exclude evidence unless the evidence varies or contradicts the agreement. But the court must first decide what the agreement says and, as a preliminary matter, must decide if it reasonably could be interpreted in different ways, given the language and the factual context surrounding the making of the agreement. Admittedly, the process is not without risk, but we believe the game is worth the candle. After all, the purpose is to produce the contract result the parties intended, not that which the judge intends. Some words are clear beyond dispute. Some may mean one thing to the judge but could have meant some-

*See, e.g., C.R. Anthony Co. v. Loretto Mall Partners,* 817 P.2d 238, 241–44 & n. 3 (N.M.1991); *Isbrandtsen v. North Branch Corp.,* 150 Vt. 575, 556 A.2d 81, 83–85 (1988); *Berg v. Hudesman,* 115 Wash.2d 657, 801 P.2d 222, 227–30 (1990); *see also* 3 CORBIN § 542, at 105–112 (Supp.1992) (citing cases).

 A judge may not always be in a position to rule on a parol evidence objection at first blush, having not yet heard enough relevant evidence on the issue. If this occurs, the judge might, for example, admit the extrinsic evidence conditionally, reserve ruling on the issue until enough relevant evidence is presented, or, if the case is being tried to a jury, consider the evidence outside the jury's presence. *See, e.g.,* Ariz.R.Evid. 103(c), 104(b), 104(c), 105. Because the judge is in the best position to decide how to proceed, we leave this decision to his or her sound discretion. As noted also, the judge need not waste much time if the asserted interpretation is unreasonable or the offered evidence is not persuasive. A proffered interpretation that is highly improbable would necessarily require very convincing evidence. In such a case, the judge might quickly decide that the contract language is not reasonably susceptible to the asserted meaning, stop listening to evidence supporting it, and rule that its admission would violate the parol evidence rule. *See* 3 CORBIN § 542, at 112; § 579, at 420.

We now apply these principles to the facts of this case.

**B. Was the release so clear that the trial judge erred in admitting extrinsic evidence to interpret it?**

Taylor released "all *contractual* rights, claims, and causes of action he ha[d] or may have against STATE FARM under the

policy of insurance ... in connection with the collision ... *and all subsequent matters." See* Appendix (emphasis added). Taylor argued that the bad faith claim sounds in tort and was therefore neither covered nor intended to be covered by the language releasing "all contractual" claims. The trial court found that

> [p]arts of the document suggest that the parties contemplated the question of the insurer's settlement of claims within policy limits. Yet on page 2 of the document, the release satisfies "all contractual rights, claims, and causes of action." As a matter of statutory or contract construction, the word "contractual" modifies the words "rights," "claims," and the words "causes of action." Although the breach of the duty of good faith and fair dealing arises out of contract, the action itself is a tort claim. Thus, there is ambiguity here. Where there is an ambiguity, parol evidence will be admitted on this issue.

Minute Entry, Jan. 12, 1987 at 1–2 (citations omitted). The court of appeals held that Taylor's bad faith action was purely contractual and therefore, unlike the trial judge, found no ambiguity in the release language. *Taylor,* mem. dec. at 16.[3] We must decide whether the release language is reasonably susceptible to Taylor's proffered interpretation in light of the evidence relevant to the parties' intent. If it is, admission of extrinsic evidence supporting his interpretation did not violate the parol evidence rule.

1. *Was the release language reasonably susceptible to differing interpretations, including that the bad faith claim was not released despite the contractual quality of such a claim?*

First, we address the court of appeals' holding that Taylor's bad faith claim was

---

thing else to the parties. It is the latter meaning that is important.

**3.** These conflicting rulings illustrate the problems inherent in finding ambiguity. Two trial judges found the agreement ambiguous, that is, "doubtful or uncertain ... [or] capable of being understood in two or more possible senses or ways." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 77 (1989). Three court of appeals judges, read-

ing the same agreement, found the meaning clear beyond all question. At one time, this court held that if one court found a contract ambiguous and another found it clear, it must be ambiguous. *See Federal Ins. Co. v. P.A.T. Homes, Inc.,* 113 Ariz. 136, 138–39, 547 P.2d 1050, 1052–53 (1976). For obvious reasons, we should discard such doctrine and have done so. *See Wilson,* 162 Ariz. at 256–58, 782 P.2d at 732–34.

only contractual and that the trial court erred by finding that the release language, which indisputably covered contractual matters, was unclear, requiring extrinsic evidence for interpretation. *Taylor,* mem. dec. at 16, 23.

The court of appeals held that to assert a bad faith claim, Taylor first had to establish a "breach of contract"; that is, he must have been able to show that State Farm "denied, failed to pay, or failed to process a valid claim." *Id.* at 16. The court held that at the time Taylor made the release agreement, his bad faith claim was contractual in nature. The release therefore unambiguously included bad faith, and parol evidence supporting the contrary was inadmissible. *Id.* at 23.[4] We disagree. The proper inquiry is not whether the claim was contractual in nature or whether the judge believed it was contractual but, instead, what the parties intended to release when they used language conspicuously less inclusive than the release of "all claims." Of course, the true doctrinal nature of the claim, if it could be determined, would be relevant evidence in the search for the parties' contracting intent. If bad faith was ordinarily and universally thought of as a "contract" claim, it would be very difficult for Taylor to argue that the *specific language* in the agreement, releasing all "contractual" matters, was reasonably susceptible to his interpretation. *See Producers Dairy Delivery Co. v. Sentry Ins. Co.,* 41 Cal.3d 903, 226 Cal.Rptr. 558, 563, 718 P.2d 920, 925 (1986) (noting parol evidence must be capable of persuading a reasonable person that the language meant something other than its ordinary meaning); *General Motors Corp. v. Superior Court,* 12 Cal.App. 4th 435, 15 Cal. Rptr.2d 622, 625–27 (Ct.App.1993) (applying plain language in a release because there was no competent evidence suggesting that the parties intended something different); Restatement § 212 cmt. b (noting that although the transaction is important, "the words of an integrated agreement remain the most important evidence of intention"). In such a case, Taylor would be in the unenviable position of arguing that "X" in fact does not mean "X." This, however, is not the case.

■ It is true that bad faith has its genesis in contract. *See Rawlings v. Apodaca,* 151 Ariz. 149, 153–54, 726 P.2d 565, 569–70 (1986). Our cases show, however, that the precise legal character of a bad faith claim may depend on the context of the discussion. *See, e.g., Deese v. State Farm Mut. Auto. Ins. Co.,* 172 Ariz. 504, 509, 838 P.2d 1265, 1270 (1992) (noting that a breach of an express covenant is not "a necessary prerequisite" for a bad faith claim); *Sparks v. Republic Nat. Life Ins. Co.,* 132 Ariz. 529, 544, 647 P.2d 1127, 1142 (holding that a bad faith claim arises out of contract for attorney fee statute), *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982); *Noble v. National Am. Life Ins. Co.,* 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981) (holding that a bad faith claim is a tort). Despite the contractual origin of an insurance bad faith claim, the seminal Arizona decision on the subject, less than six months old at the time State Farm and Taylor made the agreement, declared that such conduct is a tort. *Noble,* 128 Ariz. at 190, 624 P.2d at 868 (Feb. 17, 1981). Although *Sparks, Rawlings,* and *Deese* post date the execution of the release, these cases demonstrate the uninterrupted recognition that bad faith has components of both tort and contract and underscore the lack of consensus in the area. *See Noble,* 128 Ariz. at 191, 624 P.2d at 869 (Struckmeyer, C.J., dissenting) (" 'The relationship between the remedies in contract and tort presents a very confusing field, still in process of development, in which few courts have made any attempt to chart a path.' ") (quoting William L. Prosser, THE

4. In light of our holding, we need not comment on whether the court of appeals correctly interpreted "the law extant at the time." *Taylor,* mem. dec. at 16. We note, however, that this court recently reaffirmed prior precedent, holding that a "breach of an express covenant is not a necessary prerequisite to an action for bad faith, ... [and the plaintiff] need not prevail on the contract claim in order to prevail on the bad faith claim, provided [the] plaintiff proves a breach of the implied covenant of good faith and fair dealing." *Deese v. State Farm Mut. Auto. Ins. Co.,* 172 Ariz. 504, 509, 838 P.2d 1265, 1270 (1992).

LAW OF TORTS § 92, at 614 (4th ed. 1971)). In fact, State Farm implicitly recognizes the dual nature of Taylor's bad faith claim by conceding its tortious quality for purposes of its statute of limitations argument. *See* State Farm's Opening Brief to Court of Appeals at 36–37 (alleging that Taylor's bad faith claim is barred by the tort statute of limitations). State Farm also abandons the claim's contractual side in arguing that attorney fees should not have been awarded. *Id.* at 49–50.

■■■ Because the legal character of bad faith was and is not universally established, the release reasonably could be interpreted as Taylor asserts. The trial court, therefore, did not err in concluding that the text of the release did not necessarily cover claims for bad faith.[5]

2. *Was there extrinsic evidence to support the conclusion that the release language was reasonably susceptible to Taylor's interpretation?*

■■■ At the time the parties made the agreement, it was obvious that Taylor had a sizable potential claim for bad faith. The release was agreed to months after the jury returned verdicts against Taylor and less than six months after this court recognized the tort of bad faith in *Noble*. Most of the alleged conduct that is the basis for Taylor's bad faith claim had already occurred. In fact, although occurring later, the Rings garnished State Farm seeking to satisfy their entire judgment, including the excess above the policy limits, based on

State Farm's liability to Taylor for alleged bad faith. *Ring v. State Farm Mut. Auto. Ins.*, 147 Ariz. 32, 33, 708 P.2d 457, 458 (Ct.App.1985). There was some evidence that Hofmann, on behalf of State Farm, directed that "general release language" be used in the agreement without expressly mentioning "bad faith."[6] The document's cryptic language supports this. Such a direction, in light of the obvious nature of the claim, supports Taylor's interpretation.

■■■ Also, State Farm internally designated the $15,000 payment to Taylor as being for uninsured motorist ("UM") coverage. Although State Farm denies its importance, its ultimate significance was for the fact finder to determine. State Farm's subsequent conduct may shed light on its understanding of what was covered by the agreement. *See Darner*, 140 Ariz. at 393, 682 P.2d at 398. This, too, supports the idea that the release is reasonably susceptible to Taylor's interpretation.

The potential size of the bad faith claim also cannot be ignored. At the time the parties entered into the release agreement, a jury had already rendered verdicts against Taylor far exceeding his insurance policy limits. Thus, the potential size of Taylor's bad faith claim was obvious. We recognize that, with few exceptions, parties are free to structure a deal in any way they wish. Nevertheless, it is arguably reasonable to conclude that Taylor and his counsel would seek something more than just the payment of a potentially bona fide $15,-

---

5. This illustrates another problem inherent in the traditional parol evidence rule applied by the court of appeals. That court believed that a bad faith claim was clearly contractual or one with a contractual interest. *Taylor*, mem. dec. at 16, 19–20. This author agrees. In the author's view, as a matter of doctrinal purity, a bad faith claim is a cause of action for breach of contract to which, for various policy reasons, a tort rather than a contract measure of damages is applied. *See Rawlings*, 151 Ariz. at 159–60 & n. 4, 726 P.2d at 575–76 & n. 4. Thus, to this author, a release of contractual claims necessarily releases a bad faith claim. The parties and their lawyers, however, seem not to be as interested in the doctrinal purity urged in note 4 of *Rawlings*. The object of contract interpretation is not to satisfy a judge's compulsive devotion to

jurisprudential theory but, instead, "to determine and make effective the *Intention of the Contracting Parties.*" 3 CORBIN § 572B, at 421 (1992 Supp.).

6. The admissibility of the evidence supporting this was objected to at trial on hearsay grounds. The trial court overruled the objection and State Farm appealed. We affirm the trial court's ruling even though its reasoning differs from ours. *See Sparks*, 132 Ariz. at 534, 647 P.2d at 1132. Clearly, neither the alleged instruction made by State Farm to Hoffman nor its reiteration to Randall was hearsay. It was the fact that the words were said, not their truth, that was legally significant. *See generally* Ariz.R.Evid. 801(d)(2); Morris K. Udall et al., ARIZONA PRACTICE—LAW OF EVIDENCE § 122 (3d ed. 1991).

000 UM claim to release a bad faith claim possibly worth millions of dollars.

Finally, and perhaps most telling, is the fact that the parties used limiting language in the release. It is reasonable to believe that if the parties had agreed to release the bad faith claim, they would not have drawn the release so narrowly—confining it to "contractual" and "subsequent" matters, with *no* mention of tort claims or bad faith. Surely, State Farm knew what language would effectively release it from Taylor's potential bad faith claim. It can be inferred that sophisticated parties in the business of settling insurance claims, faced with the task of releasing a claim as large as Taylor's, would have used more specific or at least broader [7] language if that was their agreement. This is especially true in light of the conspicuous nature of the claim, the parties' obvious knowledge of its existence, and the very recent supreme court authority characterizing the claim as a tort. *Compare Edwards v. Comstock Ins. Co.*, 205 Cal.App.3d 1164, 252 Cal.Rptr. 807, 808, 810 (1988) (holding that broad language releasing "all" claims "whether in contract, tort or otherwise" necessarily included a bad faith claim) *with Asare v. Hartford Fire Ins. Co.*, 1 Cal.App. 4th 856, 2 Cal.Rptr.2d 452, 455–56 (1991) (finding a release of workers' compensation claim did not necessarily include the release of a discrimination claim, noting, among other things, that although aware of the latter, the release made "no explicit reference" to the discrimination claim). For these rea-

sons, we hold that extrinsic evidence produces support for Taylor's contention that the release language was not intended to release his bad faith claim.

 This is *not* to say, however, that the release language excluded bad faith as a matter of law. Substantial evidence supports State Farm's interpretation as well. The release language is broad enough to release something more than just the contractual UM claim.[8] Also, the recitals refer to matters that may not pertain to UM coverage but are relevant to Taylor's bad faith claim.[9] Finally, there was credible evidence that both parties contemplated that bad faith would be covered by the release. All of the evidence, however, does not render the release language impervious to Taylor's interpretation. Instead, it demonstrates that there were three reasonable, but conflicting, interpretations of the language used in the agreement: (1) the parties agreed to release the bad faith claim; (2) the parties agreed to exclude the bad faith claim; and (3) the parties did not reach any agreement regarding release of the bad faith claim (in which case, of course, the claim would not be released). In light of this, the trial judge correctly concluded that the release could not as a matter of law be interpreted to include or exclude Taylor's bad faith claim.

**C. Was the parol evidence for the jury?**

 Whether contract language is reasonably susceptible to more than one

---

7. State Farm apparently did not insist that the release contain the broad language usually found in insurance company forms—releasing *all* claims of whatever nature, known or unknown.

8. There was evidence that Randall believed that at least one claim other than UM and bad faith remained—a medical payment claim—that was released by the agreement. At oral argument, it was conceded that any medical payment claim would have been released by the agreement. Whether or not that claim was valid, Randall's belief dispels the notion that bad faith was the only claim other than UM that could have been contemplated by the breadth of the release language.

9. We recognize, as did the court of appeals, that a contract should be interpreted, if at all possi-

ble, in a way that does not render parts of it superfluous. *Taylor,* mem. dec. at 18. State Farm, however, strenuously argued this very point to the jury, which nevertheless remained unconvinced—a permissible result. *Cf.* Restatement § 203 cmts. a & b. Also, State Farm argues that any uncertainty in the language should be construed against the drafter. This rule, however, is subordinate to the rule that the intent of the parties should govern. *Polk*, 111 Ariz. at 495, 533 P.2d at 662. In any event, it is the *missing* language of "bad faith" that makes this agreement unclear. Although Randall drafted the agreement, he alleges that State Farm is responsible for the omission. Thus, it is unclear who, if anyone, the rule should be applied against.

interpretation so that extrinsic evidence is admissible is a question of law for the court. *See Leo Eisenberg & Co., Inc. v. Payson,* 162 Ariz. 529, 532–33, 785 P.2d 49, 52–53 (1989). We have concluded in the preceding section that the language of the agreement, illuminated by the surrounding circumstances, indicates that either of the interpretations offered was reasonable. Because interpretation was needed and because the extrinsic evidence established controversy over what occurred and what inferences to draw from the events, the matter was properly submitted to the jury. *See Burkons,* 168 Ariz. at 351, 813 P.2d at 716; *Leo Eisenberg,* 162 Ariz. at 533, 785 P.2d at 53. The trial judge, therefore, instructed the jury as follows:

> ... [State Farm] has alleged the affirmative defense of release. In this regard, [State Farm] contends that the agreement ... was intended by the parties thereto to, among other things, release [State Farm] from all bad faith claims.
>
> ... Whether the parties intended the bad faith claims to be released is for you to determine. If you find that the parties to said agreement intended thereby that [State Farm] be released from bad faith claims, then your verdict must be for [State Farm].
>
> . . . .
>
> A release is to be construed according to the intent of the parties to it. This intention is to be determined by what was within the contemplation of the parties when the release was executed, which, in turn, is to be resolved in the light of all of the surrounding facts and circumstances under which the parties acted.

Reporter's Transcript, Mar. 12, 1987, at 184–85.[10] The instruction states the issue quite clearly. So instructed, the jury resolved the release issue in Taylor's favor.[11] We leave that resolution undisturbed.

## CONCLUSION

The trial court properly considered and then admitted extrinsic evidence to interpret the release and determine whether it included Taylor's bad faith claim. That question, in this case, was appropriately left to the trier of fact. There remain other issues not resolved by the court of appeals. We are aware of the frustration that additional delay imposes on all involved, especially in a case as old as this. Nevertheless, because the other issues were initially and fully presented to the court of appeals, prudence dictates that the court of appeals complete its review of this case as expeditiously as possible. The decision of the court of appeals pertaining to the release is vacated and the matter is remanded to the court of appeals for resolution of the remaining issues.[12]

MOELLER, V.C.J., ZLAKET, J., and JAMES D. HATHAWAY, Judge, concur.

Justice FREDERICK J. MARTONE did not participate in this matter; pursuant to Ariz. Const. art. VI, § 3, Judge JAMES D. HATHAWAY of the Court of Appeals, Division Two, was designated to sit in his stead.

CORCORAN, Justice, specially concurring:

I concur with the opinion—but without enthusiasm. It is certainly true that wavering and overlapping lines of interpretation, rather than bright straight borders prevail in this area of contract interpreta-

---

10. There are two trial transcripts dated March 12, 1987. Although one may have been misdated, we use the date that actually appears on the transcript.

11. Contrary to the misgivings expressed in the concurring opinion, the *Melson* rule does not relegate more responsibility in contract disputes to the court. Even prior to *Melson,* the determination of whether contract language was ambiguous (a claim often raised) was a question of law for the court to determine. *See, e.g., Associ-*

*ated Students of the Univ. of Arizona v. Arizona Board of Regents,* 120 Ariz. 100, 104, 584 P.2d 564, 568 (Ct.App.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1226, 59 L.Ed.2d 462 (1979).

12. We also granted review of the trial court's summary dismissal of Taylor's punitive damage claim. In light of our decision to remand, we leave resolution of this issue to the court of appeals.

tion. I don't know whether our opinion helps.

The canon of interpretation which we propound today is amorphous. The problem with an amorphous rule is that in the end, only *this* court can make a *final* determination in construing any contract. Our interpretation will be based upon which parol evidence impresses us the most. That ultimately means that this court *must* decide every contract dispute subject to this analysis. As the history of this case shows, the trial court may go one way and the court of appeals another and this court yet another.

I fear that this opinion makes this court the supreme court of arguments "that white is black and that a dollar is fifty cents"—to use the colorful words of Professor Corbin.

## APPENDIX

Full Text of Release:

### *AGREEMENT*

This Agreement made and entered into this 4th day of August, 1981, by and between BOBBY SID TAYLOR and the STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, (hereinafter referred to as STATE FARM), by and through its agent undersigned.

WHEREAS, BOBBY SID TAYLOR was covered by an automobile insurance policy issued by STATE FARM, which was in effect on the 9th day of April, 1977, providing liability and uninsured motorist coverage to him, and

WHEREAS, an automobile collision occurred on April 9, 1977 between vehicles operated by BOBBY SID TAYLOR, DOUGLAS ALAN WISTROM and ANNE L. RING, and

WHEREAS, a trial took place in the Superior Court of Maricopa County, State of Arizona in consolidated causes C-382960 and C-383090, resulting in a jury verdict against BOBBY SID TAYLOR in the total amount of $2,621,000, and judgments having been entered against BOBBY SID TAYLOR in accordance with said jury verdicts, and

WHEREAS, having been fully apprised of all settlement offers made by the plaintiffs in the consolidated cases referred to above, during the discovery process, prior to trial, during the trial, and subsequently,

BOBBY SID TAYLOR maintained and does now maintain that the operation of his motor vehicle on April 9, 1977 did not contribute to the injuries sustained by the plaintiffs, and at no time has he insisted, demanded, or even encouraged his insurer to settle the plaintiffs' claims within his policy limits, and

WHEREAS, one of the drivers of an automobile involved in the collision on April 9, 1977, to wit: DOUGLAS ALAN WISTROM, was uninsured on the date of said collision, and BOBBY SID TAYLOR having a bona fide belief that the negligence of DOUGLAS ALAN WISTROM contributed to his bodily injuries sustained in that collision, and

WHEREAS, BOBBY SID TAYLOR has demanded compensation from STATE FARM under the uninsured motorist coverage afforded to him, and

WHEREAS, BOBBY SID TAYLOR desires to settle the uninsured motorist claim, and to relieve STATE FARM of any and all other contractual claims, interests, or causes of action he has or may have against STATE FARM, and

WHEREAS, STATE FARM has agreed that uninsured motorist coverage is available to BOBBY SID TAYLOR and appropriate under the facts surrounding the collision on April 9, 1977, and STATE FARM having been fully apprised in the premises,

THEREFORE, in consideration of the mutual [cov]enants contained herein, STATE FARM agrees to pay the sum of $15,000 to BOBBY SID TAYLOR in full satisfaction of all contractual rights, claims, and causes of action he has or may have against STATE FARM under the policy of insurance referred to herein, in connection with the collision on April 9, 1977, and all subsequent matters, and BOBBY SID TAYLOR hereby accepts that sum pursuant to the recitals contained herein.

[SIGNATURES]