# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BROWN & BAIN, P.A., an Arizona
professional association,
            *Plaintiff-Appellee,*

v.

JOHN M. O'QUINN, an individual;
JOHN M. O'QUINN & ASSOCIATES
L.L.P., a Texas limited liability
partnership; JOHN M. O'QUINN, a
Texas professional corporation;
JOHN M. O'QUINN LAW FIRM
PLLC, a Texas limited liability
company; O'QUINN, KERENSKY &
MCANINCH; JANE DOE O'QUINN,
            *Defendants-Appellants.*

No. 06-15931

D.C. No.
CV-03-00923-ROS

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted
February 13, 2008—San Francisco, California

Filed March 6, 2008

Before: John T. Noonan, Sidney R. Thomas, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Noonan

## COUNSEL

Neil C. McCabe, Houston, Texas, for the defendants-appellants.

Lawrence A. Kasten, Phoenix, Arizona, for the plaintiff-appellee.

## OPINION

NOONAN, Circuit Judge:

Brown & Bain, P.A. (Brown & Bain), a Phoenix law firm, sued John M. O'Quinn, et al. (O'Quinn), a Houston law firm, for fees owed to it on the termination of a lawsuit. The district court gave judgment for Brown & Bain. O'Quinn appeals. The case is not without interest for the professional responsibility of lawyers *inter se*. We affirm the judgment of the district court.

### FACTS

In 1991, approximately nine hundred claimants in the Phoenix area joined in a suit against Motorola alleging damages of over $100 million from environmental contamination. The law firm bringing the action dissolved. In 1993, O'Quinn took on the representation of most of the claimants (the *McIntire* Plaintiffs). Per contract with O'Quinn, each plaintiff agreed that O'Quinn would be paid a contingent fee of 40% "of the total sums or fair market value of property collected or received from trial or settlement of Client's claims." Each client was to receive 60% "of the total recovery or settlement, less the costs and expenses of litigation." The client agreed that "all court costs and expenses of litigation Attorneys have paid or incurred" should be "reimbursed out of Client's 60% share of the Total Recovery by settlement or otherwise." For

this purpose, expenses were defined to include but not be limited to "depositions, expert witness and consultant fees, surveys, maps, copies, exhibits, testing, models, travel, meals, lodging, storage, rentals, equipment, and other expenses reasonably necessary to the prosecution of the claims other than the salaries and normal office overhead of Attorneys."

On April 16, 1993, O'Quinn engaged Brown & Bain to assist in the suit. The "engagement letter," drafted by Brown & Bain, provided that Brown & Bain would be paid $135 per hour for attorneys' time and $45 per hour for paralegal time — a rate identified in the engagement letter as "the discount rate." At the termination of the action by trial or settlement, Brown & Bain was entitled to an additional payment of $155.25 per hour for attorney's time and $51.75 per hour for paralegal time. These "additional payments" were not to be paid Brown & Bain "until an amount equal to the discount rate payments previously paid to [Brown & Bain] are recovered by [O'Quinn] and the other plaintiffs' counsel working on the matter (in the aggregate) from the proceeds of the litigation. After [O'Quinn] and the other plaintiffs' counsel working on the matter (in the aggregate) have recovered an amount equal to the discount rate payments (exclusive of costs reimbursement, which are to come from plaintiffs' share of the recovery), the remainder of our respective recoveries will be divided one-half to [O'Quinn] and the other plaintiffs' counsel working on the matter and one-half to Brown & Bain until our additional payments have been fully paid. Any recovery remaining after payment of Brown & Bain's discount rate and additional payments in this action belongs to [O'Quinn] and the other plaintiffs' counsel working on the matter."

In accordance with the engagement letter, Brown & Bain billed O'Quinn on a monthly basis and was paid the discount rate monthly to a total of $2,920,975.17 for 26,000 hours of work.

In June 1998, O'Quinn and Brown & Bain parted ways — Brown & Bain says because its role in the management of the case was being marginalized; O'Quinn says because a decision in an Arizona state case cast grave doubt as to success in the *McIntire* case. Brown & Bain wrote O'Quinn that "now is the time for Brown & Bain to step aside gracefully" and suggested Peter Osetek as a Phoenix lawyer who could replace it as local counsel. On August 31, 1998, Brown & Bain moved to withdraw as counsel; on September 1, the motion was granted. The record shows no objection by O'Quinn or any of the plaintiffs. The record does show that Peter Osetek was paid $768,550 by O'Quinn.

The record also shows that as early as March 1996, the new Phoenix law firm of Allen & Price had been formed and had offered to work on the *McIntire* litigation at "a significantly lower cost" than Brown & Bain's "standard rate" of $230 an hour. The new firm had been formed by two former partners in Brown & Bain, of whom one, Charles S. Price, had "a significant personal and professional investment in the *McIntire* case." The record shows that O'Quinn paid Allen & Price $114,088.

In addition to retaining local counsel, O'Quinn opened its own office in Phoenix, devoted wholly to the *McIntire* litigation. O'Quinn's "internal Settlement Sheet" states "Office Salaries — Phoenix" as $4,583,523.41 and "Office Exp.— Phoenix" as $2,594,812.64.

In January 2002, O'Quinn settled the *McIntire* case. Motorola agreed to pay $26,301,921.39. O'Quinn treated $13,727,597.66 of this amount as costs chargeable to its clients. It paid the clients $2,467,335.12. O'Quinn retained roughly 40% of the settlement, $10,106,988.61. Brown & Bain asked to be paid the additional payments provided by the engagement letter. O'Quinn refused.

## PROCEEDINGS

On March 28, 2003, Brown & Bain filed this suit for breach of contract in Arizona state court. O'Quinn removed the action to federal court and also filed a counterclaim for repudiation of the contract. In December 2003, both sides filed for summary judgment. On September 30, 2004, District Judge Susan R. Bolton gave partial summary judgment for Brown & Bain. Applying the *Restatement (Third) of the Law Governing Lawyers* §§ 37 and 40, Judge Bolton ruled that Brown & Bain had not forfeited the additional payments by withdrawing. No misconduct by the firm had been shown. The additional compensation would not prejudice the clients. Judge Bolton also denied O'Quinn's motion for summary judgment, but reserved the question of whether Brown & Bain was owed the additional payments.

On February 22, 2006, District Judge Roslyn O. Silver ruled that under Arizona law the engagement letter had created an obligation for O'Quinn to make the additional payments. The court took note of the opinion submitted by Geoffrey Hazard, O'Quinn's expert, that under Arizona Rules of Professional Conduct ER 1.5, a lawyer's fee had to be reasonable and that Brown & Bain's was not. The court observed that Hazard's treatise *The Law of Lawyering* states that lawyers "are generally held to their contract as between themselves so long as the total fee paid by the client is not unreasonable." 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 8.22 at 8 56.1 (3d ed. 2001 supp.). Payments to Brown & Bain would not affect the fees paid by the clients. The court gave summary judgment for Brown & Bain.

O'Quinn appeals.

## ANALYSIS

Two issues are presented by O'Quinn: (1) whether the term "recovery" in the engagement letter is so clear that its mean-

ing could be determined as a matter of law and (2) whether Brown & Bain had abandoned the contract and so was not entitled to further compensation. We review de novo, viewing the evidence in the light most favorable to O'Quinn, the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We apply Arizona law. When interpreting a contract, Arizona courts attempt to ascertain and give effect to the intention of the parties at the time the contract was made." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1139 (Ariz. 1993) (internal citation omitted). A court will consider extrinsic evidence only if the contract language is "reasonably susceptible to the interpretation asserted by its proponent." *Id.* at 1140.

O'Quinn's position is that its liability for the additional payments began only when O'Quinn had recovered all the expenses it had absorbed. On the basis of its own accounting to itself, O'Quinn made absolutely no recovery from the litigation but suffered a loss of $3,195,174.19. Its Internal Settlement Sheet shows the following amounts that O'Quinn deducts from the proceeds it received as its 40% share of the settlement.

UNRECOVERED EXPENSES NOT CHARGED TO CLIENTS:

| | |
|---|---|
| Allen & Price | 114,088.00 |
| Brown & Bain Inc. | 2,920,975.17 |
| Cohen Kennedy Down & Quigley | 165,659.00 |
| Peter Osetek | 768,550.00 |
| Robert N. Hinton & Associates | 662,500.00 |
| Contract Legal | 212,829.48 |
| Office Salaries-Phoenix | 4,583,523.41 |
| Office Exp-Phoenix | 2,594,812.64 |
| Dennis Reich & Stephanie Shapiro | 1,000,000.00 |
| Additional Expenses | 293,152.54 |

[1] O'Quinn's argument fails, most notably because the payments to Brown & Bain are to be made when O'Quinn has

"recovered an amount equal to the discount rate payments (exclusive of costs reimbursement[s], which are to come from plaintiffs' share of the recovery)." According to the plain language of this provision, costs reimbursements are not to be deducted in determining the "amount equal to the discount rate payments." O'Quinn's obligation is triggered when it has recovered an amount — not a net amount — equivalent to the payments already made. Unquestionably, when O'Quinn received an amount of over $10 million from the settlement, it had recovered several times the $2.9 million it had disbursed in discount rate payments.

**[2]** The additional payments are to be made only after O'Quinn and "other plaintiffs' counsel" have received "in the aggregate" an amount equal to the discount payments already made. On O'Quinn's construction of the contract and its estimate of its expenses, the amounts received by all the lawyers should be aggregated and the sums paid to the other plaintiffs' lawyers such as Allen & Price, Osetek, and Brown & Bain itself would then be deducted; so the aggregation of the fees would be an exercise in futility. That can't be what the contract means. It is the total gross amount received by the lawyers that acts as the trigger for the "additional payments" to Brown & Bain.

The term "recovery," on which O'Quinn's argument focuses, is used first in the phrase relating to the reimbursement of costs. In that context it must mean "gross recovery" because the phrase provides for charging the costs against what the plaintiffs received. The second time "recovery" is used, it again specifies the gross amount, to which, after specified deductions, O'Quinn is entitled.

**[3]** The client engagement letters, drafted by O'Quinn, use "settlement" as an alternative to "total recovery." In this usage, O'Quinn equated what was received in a settlement to "the total recovery," then carefully provided for the deduction of costs and expenses. This contract language is in stark con-

trast to that of the Brown & Bain engagement letter's promise to pay Brown & Bain after O'Quinn had recovered "an amount equal to the discount rate payments . . . from the proceeds of the litigation." The proceeds are not restricted to net proceeds.

[4] O'Quinn's second line of defense attempts to draw on the opinion letter furnished by an outstanding authority on legal ethics and lawyering, Professor Geoffrey Hazard. Professor Hazard does not profess to comment on the engagement letter itself, but first on whether Brown & Bain's compensation would violate Arizona Rules of Professional Conduct ER 1.5 by being unreasonable. He accepts as proper the charges to itself made by O'Quinn against the $10 million it recovered instead of charging them against the clients. The result of O'Quinn's absorbing the charges, he notes, was to "have a little more money" for the clients. The propriety of O'Quinn's charges is, however, not the issue. However ethically appropriate, the absorption of the charges did not diminish what O'Quinn had received from the proceeds. However it accounted to itself, it remained liable to Brown & Bain for the amount it had agreed to pay after it had received an amount equivalent to the discount rate payments.

Accepting O'Quinn's Internal Settlement Sheet, Professor Hazard believed O'Quinn had suffered a loss of $3.2 million while Brown & Bain was attempting to get a total fee of $6.2 million. He thought that unreasonable and unethical. But Arizona Rules of Professional Conduct ER 1.5 govern the relation between lawyer and client, not between lawyer and lawyer. As Judge Silver noted, additional payments to Brown & Bain would have no effect on the fees already charged the client.

[5] It might be urged, nonetheless, that O'Quinn had absorbed the expenses in order to save something to give the clients. Even with this indulgence, individual clients averaged only $2,100 apiece. They might not have agreed to any settle-

ment if they had gotten nothing. But O'Quinn's necessity of putting something on the table for the clients does not determine the reasonableness of the allocation of charges among the lawyers themselves.

O'Quinn's alleged loss is actually unproved. On its Internal Settlement Sheet the single largest payment is $4,583,523 for Office Salaries-Phoenix. This charge was not generated by overhead for the Phoenix office, listed separately as $2,594,812. Nothing in the record shows the Phoenix salaries to be different from the Houston salaries of O'Quinn. If "loss" was to be part of its case, O'Quinn had the burden of establishing it.

Other items on the Internal Settlement Sheet went to lawyers identified in the record — Allen & Price; Osetek; Robert N. Hinton & Associates; Dennis Reich; Stephanie Shapiro; Brown & Bain itself. These amounts paid as attorneys' fees were not properly costs to O'Quinn; they were income and potential profit to the attorneys. If salaries and lawyers' fees are excluded from O'Quinn's expenses, its total expenses dwindle from $13.3 million to less than $3 million, for "Office Exp.—Phoenix" and unspecified "Additional Expenses." O'Quinn does not establish a loss.

Professor Hazard also wrote in his opinion letter that Brown & Bain's "quitting was a breach of its contractual obligations with O'Quinn" and that Brown & Bain "had an obligation to consider the interests of the clients." He noted that the *Restatement (Third) of the Law Governing Lawyers*, § 32, Comment c provides that a lawyer "ordinarily should see [a representation] through to the contemplated end" when failure to do so would inflict a burden on the client.

[6] No evidence, however, was presented by O'Quinn that any burden was put on any client by Brown & Bain's withdrawal. Brown & Bain gave ample notice of its desire to withdraw and designated a lawyer, in addition to Allen & Price,

who could be local counsel for O'Quinn, which had its own amply funded office in Phoenix. It was part of O'Quinn's defense to show that the withdrawal of Brown & Bain had burdened the clients. O'Quinn did not do so.

**[7]** O'Quinn has not persuaded us that either Judge Bolton or Judge Silver erred in their rulings. Rather, they interpreted the engagement letter in accordance with Arizona law and faithfully applied the *Restatement of the Law Governing Lawyers*.

For these reasons, the judgment is AFFIRMED.

Costs are awarded to Brown & Bain.