**COHANZICK PARTNERS, L.P.,**
**A Limited Partnership,**
**Plaintiff,**

v.

**FTM MEDIA, INC., Defendant.**

**No. 00 Civ. 4013(CM).**

United States District Court,
S.D. New York.

Oct. 31, 2000.

Raymond Fitzgerald, David J. McCarthy, Butler, Fitzgerald & Potter, New York City, for Plaintiff.

Mark S. Mulholland, Ruskins, Moscou, Evans & Faltischek, P.C., Mineola, NY, for Defendant.

## DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DISMISSING COUNTERCLAIM, AND ORDERING INQUEST ON ATTORNEYS' FEES

McMAHON, District Judge.

Plaintiff Cohanzick Partners, L.P., has moved for summary judgment awarding it $400,000, which is the amount of bridge financing advanced by plaintiff to Defendant FTM Media, Inc., plus interest and attorneys' fees. The debt is evidenced by a Note. FTM insists that plaintiff elected to convert that bridge financing to equity pursuant to paragraph 3.1 of the Note, thus vitiating defendant's obligation to repay the bridge loan. FTM, which seeks a declaration that it no longer owes Cohanzick the $400,000, urges that there are genuine issues of material fact that preclude the entry of summary judgment in Cohanzick's favor. Cohanzick seeks dismissal of FTC's counterclaims, none of which can stand if Cohanzick prevails on its complaint.

Unfortunately for FTM, I can find no disputed issue of fact in the record before me, and the contract construction issues presented by the various documents in the record are as straightforward under Arizona law (which governs) as they would be under New York law. Accordingly, Cohanzick's motion for summary judgment is granted and the counterclaims are dismissed.[1]

---

1. I see no need for oral argument on this motion, which is being decided on documentary evidence.

## BACKGROUND FACTS

The following facts are for the most part undisputed. On this motion for summary judgment, I view them, as I must, in the light most favorable to the non-moving party, FTM.

Cohanzick is a private equity investor. It was first introduced to FTM some time in late 1999, when FTM (or "Feed the Monster") Media, Inc., an electronic media and content developer for major-market radio stations, was seeking investors in its private placement. Cohanzick's management received materials relating to FTM's private placement, and, on or about January 17, 2000, met with Ron Conquest of FTM to discuss the private placement. (Sherman Aff. ¶ 8; Conquest Aff. ¶ 4)

Subsequently, Cohanzick was asked to provide FTM with bridge financing until FTM could complete the private placement. Cohanzick expressed an interest in providing such financing to FTM. FTM then provided Cohanzick with draft documents regarding the bridge financing. The documents as originally drafted included the Note, a Warrant, and two separate documents legended "agreement:" a Loan Agreement and a Subscription Agreement.

After negotiations, the documents were revised to reflect the parties' agreement that Cohanzick and another entity, Cohanzick High Yield Partners, L.P., would each make a separate bridge loan to FTM. The loan from Cohanzick was to be in the amount of $400,000 and the loan from Cohanzick High Yield Partners, L.P., was to be in the amount of $100,000. The parties also agreed that, for each loan, there would be separate transaction documents, consisting of a Subscription Agreement, a Senior Promissory Note and a Warrant. (Sherman Aff. ¶¶ 9–10; Conquest Aff. ¶¶ 5–7)

On or about February 29, 2000, FTM executed and delivered to Cohanzick the Senior Promissory Note in the principal amount of $400,000. (Ex. F) [2] At the same time FTM also delivered to Cohanzick an executed Subscription Agreement (Ex. G), and an executed Warrant. (Ex. H) David K. Sherman, the President of Cohanzick, (i) executed the Subscription Agreement, (ii) returned the signed Subscription Agreement to FTM, and (iii) caused $400,000 to be wired to FTM. Cohanzick retained the executed Warrant. (Sherman Aff. ¶ 11; Conquest Aff. ¶¶ 7–8) [3] It is undisputed that the parties did not execute the Loan Agreement that had been included in the original set of draft documents prepared by FTM and sent to Cohanzick. Indeed, FTM candidly admits that Sherman rejected the idea of a second "Agreement" as "repetitive." (FTM's Rule 56.1 Statement of Facts ("FSOF") at ¶ 3)

Under the terms of the Note, FTM promised to pay to Cohanzick the principal sum of $400,000, together with interest thereon at the rate of 10% per annum, upon the earlier of (i) FTM's receipt of the proceeds generated from the closing of FTM's Private Placement "Minimum" offering, or (ii) 180 days from February 29, 2000. (Ex. F at ¶ 2)

The Note also contains a provision that allows Cohanzick to elect, at its sole option, to convert the unpaid portion of the Note, including any accrued interest, into equity in FTM. (See Ex. F at ¶ 3) The Note requires that the "Holder shall give the Company one (1) day notice of such conversion." (See Ex. F at ¶ 3) As for the manner of proper notice, the Note provides that

> any notice required or permitted to be given hereunder shall be given by the Company to Holder or Holder to the

**2.** References to "Ex. __" are references to the corresponding Exhibit to the Affidavit of David Sherman, sworn to on September 1, 2000.

**3.** The same process occurred at the same time with respect to the $100,000 loan from Cohanzick High Yield Partners, L.P. (Sherman Aff. ¶ 11 & n. 1)

Company *in accordance with Agreement.*

(Ex. F at ¶ 6.3) (emphasis added)

The word "Agreement" is not a defined term in the Note (Ex. F), and, as noted above, FTM had originally proposed that the parties sign two different agreements: the Loan Agreement and the Subscription Agreement. Predictably, each of those proposed agreements contains a differently-worded notice provision. The Subscription Agreement provides that any notice that may be given must be in writing. Specifically, paragraph 8.2 of the Subscription Agreement, states:

> All notices, requests, demands and other communications which are required to be or may be given under this Agreement to any party to any of the other parties *shall be in writing* and shall be deemed to have been duly given and received when (a) delivered in person, the day following dispatch by an overnight courier service (such as Federal Express or UPS, etc.) or (b) five (5) days after dispatch by certified or registered first class mail, postage page, return receipt requested, to the party to whom the same is so given or made:

> If to the Company addressed to:  
> FTM Media, Inc.  
> 6991 East Camelback Road  
> Suite D-103  
> Scottsdale, Arizona 85251  
> Attn: Scott Manson

> If to Purchaser:  
> COHANZICK PARTNERS, L.P.  
> c/o Cohanzick Management, Inc.  
> 427 Bedford Road  
> Suite 230  
> Pleasantville, New York 10570

(Ex. G at ¶ 8.2) (emphasis added). The draft Loan Agreement, by contrast, provided as follows:

> Although any notice required to be given hereunder might be accomplished by other means, notice will always be deemed given when placed in the United States mail, with proper postage pre-

paid, or sent by overnight delivery service in each case to the addresses set forth below.

(FSOF ¶ 11) However, as noted above, the draft Loan Agreement was never signed. Thus, the only "Agreement" between the parties was and is the Subscription Agreement, which was executed contemporaneously with the Note and which refers to and requires the execution and delivery of the Note. (Ex. G at ¶¶ 1, 2, 5.3) In the Subscription Agreement, the term "Agreement" is defined as the Subscription Agreement. (Ex. G at first line) [4]

In a letter dated March 27, 2000, FTM advised Cohanzick that FTM had successfully completed the minimum requirements associated with its Private Placement. (Ex. I) Pursuant to the terms of the Note, the successful completion of the minimum requirements associated with FTM's Private Placement triggered the maturity of FTM's obligation to repay the debt due under the Note. (Ex. F at ¶ 2; Sherman Aff. ¶ 15) The March 27, 2000 letter also stated: "FTM hereby call is [sic] Promissory Note in the name of Cohanzick Partners, L.P. in the amount of $400,000 for conversion into 53,333 Units of the Private Placement." FTM included with the letter a "conversion election form for your use." (Ex. I)

The parties dispute the genesis of this letter. FTM insists that Sherman had telephoned FTM's Ron Conquest, orally exercised the conversion option, and asked for a letter acknowledging his election to convert. (FSOF ¶¶ 14–18). Cohanzick insists that this never happened, and points for support to the language of the "confirmatory" letter. The text of that letter indicates that FTM, not Cohanzick, was making the election to call the note for conversion—an option that was discussed during negotiations but was dropped at the

---

**4.** The terms Note, Warrant, and Agreement are capitalized each time any of the terms are used in any of those three documents to the transaction, even though the capitalized term may only have been defined in one of the documents. Thus, for example, the capitalized word "Note" is only defined once in the Senior Promissory Note (Ex. F) but then the capitalized term is used throughout the Subscription Agreement. (Ex. G)

instance of Cohanzick. FTM had originally suggested that the transaction documents provide that FTM had the option to compel Cohanzick to convert the Note into equity but Sherman refused to enter into such an agreement and insisted that the Note provide—as it does—that the conversion option could only be exercised by Cohanzick. (Sherman Aff. ¶ 13) As Sherman did not wish to convert the Note into FTM equity, he did not sign or return to FTM the "conversion election form" that FTM had provided for his use.[5]

On April 10, 2000, Conquest, on behalf of FTM, forwarded a written communication to Sherman stating: "*As FTM previously called for the Conversion* of the Cohanzick Partners, L.P. Bridge Note in the amount of $400,000 please forward via fax the executed conversion form previously requested." (emphasis added) Conquest also stated that FTM would retire the $100,000 bridge note to Cohanzick High Yield Partners, L.P. (Ex. J) This communication is notable for its continued use of the concept that FTM could call (and, indeed, had called) for the conversion of the Note into equity—an idea that was nowhere incorporated into the Note, and that contradicted the Note's express terms. Thus, not surprisingly, Mr. Sherman did not sign or forward to FTM, via fax or otherwise, the executed conversion form that FTM "previously had requested."

On or about April 11, 2000, FTM issued a public announcement that it had been successful in raising over $6 million from its Private Placement. That public announcement confirmed what FTM had already told Cohanzick in the March 27, 2000 letter—that FTM successfully had completed its Private Placement. Pursuant to the terms of the Note, the completion of the Private Placement had triggered the maturity of FTM's obligation to repay the Note. (Sherman Aff. ¶ 20)

On May 8, 2000, Cohanzick demanded payment of the full amount due under the Note, including the accrued interest thereon. (Ex. K; Sherman Aff. ¶ 21) FTM refused to pay to Cohanzick the amount due under the Note, claiming that, prior to March 27, 2000, Sherman, on behalf of Cohanzick, had orally informed Conquest that Cohanzick (not FTM, as stated in Conquest's written communications on the subject) elected to convert its Note into FTM equity, and had asked "for a written conversion election form." (Ex. E at ¶ 9) There is no dispute that Cohanzick has never made such an election in writing.

FTM has not issued the stock that it now contends was due upon Cohanzick's alleged oral notice to convert the Note. FTM did pay off the note held by Cohanzick High Yield Partners, L.P.—even though it now asserts that Mr. Sherman orally notified Mr. Conquest that Cohanzick High Yield Partners, L.P., like plaintiff herein, was converting its Note into FTM equity. (Sherman Aff. ¶¶ 17–18; Ex. E at ¶¶ 9–11)

## PROCEDURAL HISTORY

Cohanzick commenced this action on May 26, 2000. Cohanzick asserts one claim in its complaint—breach of contract for failure to pay the amount due under a promissory note executed by FTM. (Ex. A)

FTM served and filed its Answer and Counterclaim on or about June 29, 2000. In its Answer, FTM admits it has not paid the $400,000 it borrowed from Cohanzick but asserts that Cohanzick is not entitled to any payment because Cohanzick allegedly elected to convert the promissory note into equity in FTM pursuant to the note. (Ex. B at ¶ 10) FTM also asserts counterclaims for declaratory relief and specific performance seeking, in essence, a court order that Cohanzick exercised an option in the promissory note to convert

---

**5.** FTM delivered to Cohanzick High Yield Partners, L.P., the same letter and conversion form that FTM had delivered to Cohanzick. Mr. Sherman also did not sign the "conversion election form" on behalf of Cohanzick High Yield Partners, L.P. (Sherman Aff. ¶ 17) Cohanzick High Yield Partners is not a party, as it has been repaid by FTM. See below.

the indebtedness to FTM equity and must therefore accept the equity of FTM in lieu of payment on the note. (Ex. B at "Counterclaims" at ¶¶ 2–18)

Cohanzick served its Reply to Counterclaim on July 24, 2000. The Reply denies the allegations in the counterclaims. (Ex. C)

On June 2, 2000, after plaintiff already had commenced this action, FTM filed a duplicative lawsuit against Cohanzick in the State of Arizona in the Superior Court of the State of Arizona, No. Cv 2000–010434(EB). (Ex. D) The defendants in the Arizona action, Cohanzick Partners, L.P. and Cohanzick Management, L.L.C., have moved to dismiss the action on the grounds of a lack of personal jurisdiction and pendency of a prior action. (Sherman Aff. ¶ 7) This Court has denied a motion to abstain in favor of the Arizona State Court action. (Transcript of Pre–Trial Conference dated September 29, 2000)

## CONCLUSIONS OF LAW

Pursuant to Fed.R.Civ.P. 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

The Second Circuit has addressed the distinction in the concepts of a genuine issue and a material fact:

> While genuineness runs to whether disputed factual issues can 'reasonably be resolved in favor of either party,' … materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law.

*Bickerstaff v. Vassar College,* 196 F.3d 435, 445 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000). Both concepts are implicated on this motion.

The parties do not dispute the amount of the loan or that the indebtedness is due and owing if the loan was not converted into equity. FTM's pleadings raise one issue—whether Cohanzick elected to convert the indebtedness to equity in FTM. That is an issue of fact, and it is a disputed issue of fact, since Conquest insists that Sherman made an oral election, while Sherman flatly denies doing so. Nevertheless, summary judgment for Cohanzick would be appropriate if this disputed fact were immaterial, or were not genuine.

The existence of a disputed but immaterial fact does not preclude the award of summary judgment. As the Supreme Court has stated, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Demery v. Extebank Deferred Compensation Plan,* 216 F.3d 283, 286 (2d Cir.2000); *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985); *Holmes v. Fell,* 856 F.Supp. 181, 182 (S.D.N.Y.1994) (Mukasey, J). Thus, if the dispute between Messers Sherman and Conquest concerning the alleged oral notice of conversion is not material, the fact of the dispute will not bar summary judgment.

Similarly, FTM's assertion that Cohanzick gave oral notice of conversion would not create a genuine issue of fact if, on the record as it stands, no reasonable jury could find for FTM. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is considered genuine only if the nonmoving party has presented evidence which would allow a reasonable jury to return a verdict in its favor. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Mauney v. Imperial*

*Delivery Servs., Inc.,* 865 F.Supp. 142, 146 (S.D.N.Y.1994) (Summary judgment is warranted "when no reasonable trier of fact could find for the non-moving party."). Evidence that is "merely colorable, or is not significantly probative," is not sufficient to defeat a motion for summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Summary judgment should be precluded only in circumstances when disputed material facts are "supported by evidence that would allow 'a rational trier of fact to find for the non-moving party.' " *Holmes,* 856 F.Supp. at 182.

Cohanzick argues that FTM has raised neither an issue of material fact nor a genuine issue of fact. I need not reach the second point, because I agree with the first.[6]

### The Note Requires Written Notice Of An Election To Convert The Note To FTM Equity

FTM refuses to pay to Cohanzick the amount due on the Note on the ground that, sometime prior to March 27, 2000, David Sherman orally informed Conquest that Cohanzick elected to convert the Note to FTM equity. (Ex. E at ¶ 9) That defense, even if true, cannot defeat summary judgment, because it is immaterial whether Sherman ever orally told Conquest that FTM elected to convert the Note.

   1. *The Only Reasonable Construction of the Word "Agreement" As Referenced in the Note is to the Subscription Agreement*

The Note provides:

Any notice required or permitted to be given hereunder shall be given by the Company to Holder or Holder to the Company in accordance with Agreement.

(Ex. F at ¶ 6.3) The reference in the Note to "Agreement" is a reference to the contemporaneously executed, interdependent Subscription Agreement, which is defined as the "Agreement." (Ex. G at first line) The Note incorporates by reference to the Subscription Agreement the notice provision in Section 8.2 of that agreement, which states:

All notice, requests, demands and other communications which are required to be or may be given under this Agreement to any party to any of the other parties shall be in writing . . . .

(Ex. G, ¶ 8.2) That section further sets forth the manner in which the written notice must be delivered. (*Id.*)

There is no dispute in this case that Cohanzick never provided to FTM with notice in writing that Cohanzick elected to exercise its right under the Note to convert the indebtedness due on the Note to equity in FTM. Under the terms of the Note, oral communications by Mr. Sherman could not constitute effective or binding notice of an election by Cohanzick to convert the Note. Cohanzick therefore is entitled to summary judgment on the Note in the full amount of the Note—$400,000—together with interest at a rate of 10% from February 29, 1999 to the date of judgment. In addition, defendants counterclaim should be dismissed.

FTM argues that the term "Agreement" was actually intended to refer to the never-executed Loan Agreement, with its considerably looser language on what constitutes notice, rather than to the Sub-

---

**6.** While recognizing that summary judgment is not the appropriate forum for a credibility contest, plaintiff devotes considerable energy to explaining why Conquest's story about the drafting of the documents, his "mistake" in failing to delete references to the "Loan Agreement" in the Note, and the alleged telephonic conversion election are incredible. I am not unsympathetic to Cohanzick's posture—especially in view of the language of FTM's "demands" for conversion, which are rather unambiguously drafted in terms that unmistakably give FTM the right to force conversion on Cohanzick—a position that even Conquest admits he was forced to drop during negotiations. However, this case can be disposed of, and is being disposed of, purely as a matter of contract interpretation, without regard to the parties' conduct.

scription Agreement, which unambiguously requires that all notices be in writing. Defendant seeks to introduce parol evidence to the effect that Cohanzick understood references in the Note to an "Agreement" to refer to the Loan Agreement—despite the fact that Cohanzick declined to enter into the Loan Agreement, allegedly on the ground that it was "repetitive." (FSOF ¶ 3) And it argues that Arizona law, which concededly governs the interpretation of the documents, permits—indeed, requires—consideration of such evidence.

■ FTM's reading of Arizona law is erroneous. While FTM cites to the leading case in Arizona on the issue of parol evidence, *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134, 1140 (1993), courts in Arizona have invoked the holding in *Taylor* to *bar* extrinsic evidence where the relevant contract language is unambiguous, or where the contract is not reasonably susceptible to the interpretation proffered by the proponent of the extrinsic evidence, or where the proffered extrinsic evidence varies, rather than explains, the written terms of the contract.

After *Taylor*, Arizona courts apply a two-step analysis in deciding what evidence to consider in interpreting a contract provision. "Before considering extrinsic evidence of the parties' intent, [the court] must determine whether the agreement's language is reasonably susceptible to the proposed interpretation." *Nahom v. Blue Cross and Blue Shield of Arizona, Inc.*, 180 Ariz. 548, 551, 885 P.2d 1113, 1117 (1994), (citing *Taylor*, 175 Ariz. at 154–55, 854 P.2d at 1140–41); *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317–18 (9th Cir.1997) (no language susceptible to competing interpretations therefore evidence not considered). *See also Taylor*, 175 Ariz. 148, 854 P.2d at 1140–41 ("the judge need not waste much time if the asserted interpretation is unreasonable or the offered evidence is not persuasive.... [T]he judge might quickly decide that the contract language is not reasonably susceptible to the asserted meaning, stop listening to evidence supporting it, and rule that its admission would violate the parol evidence rule.").

■ Defendant's interpretation fails under the first step of the analysis. The word "Agreement" in the Note cannot reasonably be interpreted to refer to an unexecuted draft of a loan agreement that the parties never signed. There is no objective evidence of Cohanzick's assent to any of the terms of the Loan Agreement; therefore, that document cannot reasonably be understood as the Agreement referenced in the Note, and its terms cannot reasonably be interpolated into the Note.

■ Furthermore, under Arizona rules of contract construction, the Note and the Subscription Agreement, which were executed at the same time and relate to the same transaction, must be constructed together as part of the same contract. *See, e.g. Realty Assocs. v. Valley National Bank*, 153 Ariz. 514, 518, 738 P.2d 1121, 1125 (1986), (citing *Pearll v. Williams*, 146 Ariz. 203, 206, 704 P.2d 1348, 1351 (Ariz. Ct.App.1985)). As such, the word "Agreement" in the Note must be given the same meaning as the word "Agreement" in the Subscription Agreement, because a word used in one portion of a contract is presumed to have the same meaning when it is used in another portion of the contract. *See McLane & McLane v. Prudential Ins. Co.*, 735 F.2d 1194, 1195 (9th Cir.1984) (the word "term" had same meaning in amendment extending lease and in option clause permitting renewal of lease). In the Subscription Agreement, the word "Agreement" is a defined term—defined to mean the Subscription Agreement. Had the parties entered into the Loan Agreement as well, the difference between the notice provisions in the two documents would have been problematic; but as they did not sign both "Agreements," the potential ambiguity disappears.

It is obvious from reading the documents together that the Subscription

Agreement was intended to be the umbrella agreement for this transaction, as it refers to the Note and to the Warrant, which were executed simultaneously. This, too, makes any suggestion that "Agreement" referenced in the Note is the rejected Loan Agreement unreasonable as a matter of contract construction.

The reference in the Note to "Agreement" is susceptible to only one reasonable interpretation; i.e., it refers to the simultaneously executed Subscription Agreement. FTM's effort to have this court conclude otherwise, by calling its attention to parol evidence where there is only one reasonable interpretation of the allegedly ambiguous term, flies in the face of the rule announced in Taylor and must be rejected. *See, Demasse v. ITT Corp.*, 915 F.Supp. 1040, 1045 (D.Ariz.1995); *Vecsel Partners v. Scottsdale Conference Center*, 29 F.3d 637, 1994 WL 315631 * 1 (9th Cir.1994); *Adams v. American Family Mut. Ins. Co.*, 185 F.3d 865, 1999 WL 386913 *2–3 (9th Cir.1999).

### 2. *Arizona's Parol Evidence Rule Bars FTM's Contention as a Matter of Law*

Cohanzick also is entitled to summary judgment because the extrinsic evidence offered by FTM contradicts a term in the contract, in violation of the parol evidence rule.

The second step in *Taylor*'s two-step analysis requires a Court to decide whether the extrinsic evidence that is offered would vary or contradict the meaning of written words in the contract. If it does, it must be precluded. *See Taylor*, 175 Ariz. at 153, 854 P.2d at 1139; *Velarde*, 105 F.3d at 1317; *In re Redpath Computer Servs., Inc.*, 181 B.R. 975, 979–80 (Bankr. D.Ariz.1995). The Arizona Supreme Court did not eliminate the parol evidence rule when it decided *Taylor*. Indeed, it expressly stated, at three separate places in the opinion, that the parol evidence rule is still applicable. *See id.* at 1138 ("the parol evidence rule prohibits extrinsic evidence

to vary or contradict . . . the agreement"); *Id.* at 1139 ("the parol evidence rule applies and precludes admission of the extrinsic evidence that would vary or contradict the meaning of the written words."); *Id.* at 1141 & n. 2 ("at least in Arizona, . . . the parol evidence rules does not apply to exclude evidence unless the evidence varies or contradicts the agreement."). Thus, even if the term "Agreement" were susceptible of more than one interpretation— and it is not—the evidence proffered by FTM could not be considered by this court if it varied or contradicted the terms of the documents that were actually signed.

The evidence proffered by FTM is unacceptable under the parol evidence rule and Taylor. As noted above, under Arizona law, the contract between FTM and Cohanzick consists of the Subscription Agreement and the Note, read together. That integrated contract contains a provision, found in the Subscription Agreement, which provides that "all notices . . . shall be in writing." FTM's extrinsic evidence is offered to show that notice can be provided otherwise than in the limited way provided for in the signed and integrated contract—i.e., orally. Such evidence obviously varies and contradicts the notice provision that currently exists in the contract. The evidence does not explain a notice provision in the contract, but rather seeks to change it. As such, the evidence is barred under Arizona's parol evidence rule. *See Apollo Group*, 58 F.3d at 482 (extrinsic evidence rejected because it contradicts parties' final agreement); *Thurston v. Citizens Utility Co.*, 1994 WL 462117 * 7 (D.Ariz., June 30, 1994), *aff'd*, 91 F.3d 155 (9th Cir.1996) (extrinsic evidence is rejected because it varied or contradicted, rather than explained or elaborated on, the terms of agreement); *In re Redpath*, 181 B.R. at 980 (parol evidence rejected because it contradicts rather than aids in interpreting, terms of the agreement). *See also Vecsel Partners*, 29 F.3d 637, 1994 WL 315631 * 1 (extrinsic evidence rejected because it is inconsistent

with written contract and therefore impermissibly contradicts or varies terms of contract).

Thus, under both prongs of the Taylor analysis, FTM's contention that "Agreement" refers to the Loan Agreement (which was never signed) rather than the Subscription Agreement (which was) must be rejected. FTM's sole defense to payment thus fails, and Cohanzick is entitled to summary judgment for the full amount of the Note, plus interest since February 10, 2000. Cohanzick is also entitled to dismissal of FTM's counterclaims, since they are all predicated on FTM's legally untenable assertion that Cohanzick converted its debt to equity.

### Plaintiff is entitled to its Attorneys' Fees in this Action and in The Arizona Action

Pursuant to the terms of the Note, plaintiff is entitled to recover the attorneys' fees incurred in enforcing its Note. Specifically, the Note provides:

> The company [defined as FTM] shall pay all reasonable costs and expenses incurred by or on behalf of Holder [defined as Cohanzick] in connection with Holder's exercise of any and all of its rights and remedies under this Note, including without limitation, reasonable attorneys' fees.

(Ex. F at ¶ 4.3) Here, Cohanzick has incurred, and will continue to incur, attorneys' fees, both in this action and in the Arizona action. FTM is liable to pay those fees, and Cohanzick is entitled to summary judgment on the question of liability. The parties are directed to contact The Hon. George A. Yanthis, United States Magistrate Judge, to schedule an inquest on attorneys' fees.

This constitutes the decision and order of the Court.