NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ALAN ROBERT OTTO, et al., *Plaintiffs/Appellees,*

*v.*

MARK WILLIAM OTTO, et al., *Defendants/Appellants.*

No. 1 CA-CV 18-0080
FILED 2-14-2019

Appeal from the Superior Court in Maricopa County
No. CV2014-011726
The Honorable David B. Gass, Judge

**AFFIRMED**

COUNSEL

Coppersmith Brockelman PLC, Phoenix
By Andrew S. Gordon, Marvin C. Ruth, Katherine L. Hyde
*Counsel for Plaintiffs/Appellees*

Kercsmar & Feltus PLLC, Scottsdale
By Geoffrey S. Kercsmar, Eric B. Hull, Callie P. Maxwell
*Counsel for Defendants/Appellants*

## MEMORANDUM DECISION

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge Kenton D. Jones joined.

**W I N T H R O P**, Judge:

¶1 This appeal involves a dispute between two brothers, Alan and Mark Otto, regarding the meaning of and obligations arising from a 2012 Equity Interest Purchase Agreement ("the Purchase Agreement") pursuant to which Alan purchased Mark's share of a group of jointly-owned family businesses (collectively, "the Otto Companies").[1] The dispute boils down to two primary questions: (1) Did Alan owe a duty to indemnify Mark for taxes owed in excess of estimated taxes projected in a "Schedule F" Purchase Price Allocation Schedule to the Purchase Agreement; and (2) Did Alan breach any terms of the Purchase Agreement? The trial court concluded that Alan did not owe such a general duty to indemnify Mark and did not breach the Purchase Agreement. Mark appeals the trial court's judgment in favor of Alan, raising numerous issues. Concluding that the trial court did not misinterpret the Purchase Agreement and substantial evidence supports the court's rulings, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 Alan and Mark were in business together for many years before they decided to part ways. The terms of the Purchase Agreement were heavily negotiated, with each brother represented by separate legal

---

[1] Alan and Mark also controlled trusts that, in some instances, held separate interests in the businesses. In this appeal, Plaintiffs/Counterdefendants/Appellees consist of Alan and Lori Otto; Alan Otto, as trustee of the Overlook Irrevocable Trust; Otto Trucking, Inc.; Otto Logistics, LLC; Otto Logistics of Colorado, LLC; Superstition Trailers, LLC; 4A Equipment, LLC; Otto Transportation, LLC; 6886 Properties, LLC; and 6886 Aviation, LLC, who we refer to collectively as "Alan." Defendants/Counterclaimants/Appellants consist of Mark and Tamela Otto, and Mark Otto, as trustee of the AOM Irrevocable Trust, who we refer to collectively as "Mark."

counsel—Alan by Andrew Gordon and Mark by Scott Weiss.  The Otto Companies retained MCA Financial Group ("MCA")—Morrie Aaron and Paul Roberts—as an independent financial consultant to help broker the deal.

¶3          The structure of the Otto Companies complicated the sale, as each business had its own financials and tax history.[2]  Further, over the years, Alan and Mark had each maximized tax advantages and deferrals from the companies to minimize their personal taxes, which they would need to account for through the sale and change of ownership, meaning the sale would likely result in a significant tax event.[3]  Otto Trucking's CFO, Bryan Adamson, and Jim Raftery, the Otto Companies' long-time accountant, used the companies' available financial information for cash flow projections and liquidation analysis.  Raftery provided this information to Mark's tax accountant and financial advisor, William Hodges, to estimate Mark's tax obligations going forward.  The projections, often referred to by the parties as Schedule F, were a spreadsheet called the Purchase Price Allocation Schedule.  The numbers in Schedule F allowed for a preliminary estimate as to the values of the Otto Companies and set forth an estimated tax basis in the various companies.

¶4          Due to the uncertainty regarding how much he would ultimately owe in taxes, Mark proposed during negotiations that Alan agree to a blanket tax indemnification provision guaranteeing the tax projections—to be included as § 6.02(iv) of the Purchase Agreement's general indemnification section, 6.02—which would ultimately require Alan to indemnify Mark for "any obligation of the Mark Otto Parties to pay amounts related to tax or other obligations that exceed those projections set forth in the Purchase Price Allocation Schedule."  Alan ultimately rejected

---

[2]      Also, the Internal Revenue Service was auditing tax returns of the Otto Companies, which needed to file amended tax returns for 2010 and 2011.

[3]      In fact, Mark was concerned Alan might do something to increase Mark's tax liability, principally by way of manipulating management fees, as the assignment of management fees had been a primary device used by Alan and Mark to shift reported income among the Otto Companies and reduce and defer their personal tax liabilities.  That concern was eventually addressed by §§ 5.02 and 5.03 of the Purchase Agreement.

the blanket indemnification, and the final version of the Purchase Agreement, executed by the parties, did not contain that provision.[4]

¶5          In September 2012, Mark and Alan, their respective trusts, and the Otto Companies entered the Purchase Agreement, which detailed the duties and warranties each side promised to uphold. In exchange for relinquishing his ownership interests in the Otto Companies, Mark agreed to receive payments totaling approximately $4.05 million (in the amount of $22,500 per month), and approximately $2 million as reimbursement for money he had previously lent the Otto Companies. After execution of the Purchase Agreement, Alan controlled the Otto Companies.

¶6          When the Otto Companies began preparing 2010 and 2011 amended tax returns and 2012 original tax returns, the tax estimates exceeded the Schedule F projections, and Mark demanded indemnification. Robert Shull, counsel for Alan, responded that it made sense to first determine Mark's actual—rather than estimated—tax liability before determining whether Alan might owe Mark any indemnification. Further, as Shull and Raftery later testified, Alan was trying to determine if a re-allocation of management fees might help Mark reduce his taxes.

¶7          Mark then refused to sign a forbearance agreement on a bank loan to the Otto Companies unless he received approximately $200,000 for his estimated taxes. In September 2013, the Otto Companies remitted $200,000 to cover Mark's estimated personal tax obligations.

¶8          In 2014, Alan filed a First Amended Complaint against Mark, asserting claims for declaratory judgment, breach of contract, unjust enrichment, and specific performance. Alan sought declaratory relief that he did not owe a duty to indemnify Mark for taxes Mark owed that exceeded the projections set forth in Schedule F. The breach of contract and unjust enrichment claims sought return of the $200,000 tax payment, which

---

[4]       MCA's Aaron and Roberts had told Hodges that Alan was unwilling to indemnify Mark and "each party should just be responsible for their taxes just like they'd been for many years." They also told him that Alan "supplied all the information needed to run different tax scenarios. If you feel it's important to advise your client, you need to run those yourself and provide the advi[c]e. Everyone knows Jim [Raftery] has done an outstanding job, but he is not advising Mark, you are." At trial, Mark did not call Hodges to testify whether he had all the information, ran any tax scenarios, or had identified any issues with the information provided to him.

Alan asserted had been conditioned upon an understanding that if Mark's 2012 tax liability was reduced, Mark would then reimburse the Otto Companies accordingly. Finally, the specific performance claim sought return of the Purchase Agreement's loan promissory note, which had allegedly been paid in full.

**¶9**      Mark answered Alan's complaint and filed a counterclaim. In his Amended Counterclaim, Mark alleged claims for breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and declaratory relief. In part, Mark alleged Alan had breached §§ 2.05, 4.02, 5.03, and 6.02 related to tax indemnity; § 5.08 related to financial reporting; and § 5.04 related to Alan's post-agreement compensation from the Otto Companies. In general, Mark asserted that, by allegedly breaching these provisions, Alan had caused Mark's taxes to exceed the figures projected in Schedule F of the Purchase Agreement. Mark's promissory estoppel claim arose out of numerous promises Alan or his agents had allegedly made that Alan would pay for Mark's taxes that exceeded the allegedly warranted amounts in Schedule F.

**¶10**      On July 24 to 27, 2017, the trial court held a four-day bench trial. As ordered by the court, the parties submitted closing memoranda on August 21, 2017, and the court took the matter under advisement.

**¶11**      On October 4, 2017, the court issued its verdict. Neither side had requested findings of fact or conclusions of law, *see* Ariz. R. Civ. P. 52(a)(1), and the court summarily found (1) Alan did not owe a duty to indemnify Mark for taxes owed in excess of the estimates set forth in the Schedule F Purchase Price Allocation Schedule to the Purchase Agreement; (2) Alan did not breach the Purchase Agreement; (3) Mark had not proven damages as a result of any alleged breaches of the Purchase Agreement; (4) Alan was entitled to recover the $200,000 tax payment advanced to Mark; (5) Alan was not entitled to pre-judgment interest on the $200,000 payment advanced to Mark; (6) Alan had paid Mark all amounts due under the loan promissory note and the attached payment schedule; (7) Alan was entitled to the return of the original executed loan promissory note; and (8) Mark was not entitled to relief on any counterclaims.

**¶12**      On January 16, 2018, the trial court entered a final judgment pursuant to Arizona Rule of Civil Procedure 54(c) in favor of Alan on all counts, awarding $200,000 in compensatory damages, $528,000 in attorneys' fees under Arizona Revised Statutes ("A.R.S.") section 12-341.01, and $12,181.65 in taxable costs under A.R.S. § 12-341.

**¶13** Mark filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 12-2101(A)(1).

## ANALYSIS

### I. *Standard of Review*

**¶14** "When reviewing issues decided following a bench trial, we view the facts in the light most favorable to upholding the court's ruling." *Bennett v. Baxter Grp., Inc.*, 223 Ariz. 414, 417, ¶ 2 (App. 2010) (citation omitted). We give due regard to the opportunity of the trial court to judge the credibility of witnesses and will not set aside the court's findings unless they are clearly erroneous. *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 51, ¶ 11 (App. 2009) (citation omitted). If substantial evidence supports a finding of fact, that finding is not clearly erroneous, even if substantial conflicting evidence exists. *Id.* at 51-52, ¶ 11 (citation omitted). In our review, we do not reweigh the evidence or substitute our evaluation of the facts. *Id.* at 52, ¶ 11. We will, however, review *de novo* the court's legal conclusions and interpretation of a contract. *See id.* at ¶ 12; *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 213 Ariz. 83, 86, ¶ 12 (App. 2006).

### II. *The Trial Court's Alleged Use of Parol Evidence*

**¶15** Mark argues the trial court erred in using parol evidence—specifically, evidence of the blanket warranty/indemnification contained in the proposed but ultimately rejected § 6.02(iv)—to create an ambiguity that contradicted the otherwise unambiguous meaning of the Purchase Agreement, thereby rendering several unambiguous provisions of the Purchase Agreement unenforceable.

**¶16** We review *de novo* whether evidence is admissible under the parol evidence rule. *Terry v. Gaslight Square Assocs.*, 182 Ariz. 365, 368 (App. 1994). In general, when parties have a written agreement, neither may present parol (extrinsic) evidence that would contradict or vary the terms of the writing. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152 (1993). However, in determining whether to allow parol evidence, the court first considers the offered evidence and, if the court "finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Id.* at 154 (citations omitted); *see also Smith v. Melson, Inc.*, 135 Ariz. 119, 121 (1983) ("A contract should be read in light of the parties' intentions as reflected by their language and in view of all the circumstances."). "The meaning that appears plain and unambiguous on the first reading of a document may not appear nearly so plain once the

judge considers the evidence." *Taylor*, 175 Ariz. at 154. Consequently, a court need not find the contract is ambiguous on its face before allowing the introduction of parol evidence. *Id.* at 152-53. Rather, the court should "consider the alleged interpretation of the agreement offered by the proponent of the extrinsic evidence in light of the extrinsic evidence offered." *State v. Mabery Ranch, Co.*, 216 Ariz. 233, 241, ¶ 28 (App. 2007).

**¶17** Mark fails to provide us with any citation to the record in support of his parol evidence argument, fails to assert or show he ever objected to the admission of parol evidence and, ultimately, has not challenged any evidentiary ruling by the trial court. *See Cedic Dev. Corp. v. Sibole*, 25 Ariz. App. 185, 186-87 (1975) (concluding that the parol evidence rule may be waived by a failure to object to allegedly improper testimony such that the trial court is entitled to consider the parol evidence in reaching its decision). Moreover, contrary to his argument, nothing within the record or the trial court's minute entry ruling or judgment suggests the court improperly admitted parol evidence to eliminate any alleged contractual indemnification obligations on the part of Alan. Instead, the court simply found Alan had not breached any clause of the contract that would have triggered the limited contractual indemnity obligations agreed to by the parties in the executed Purchase Agreement. Further, in this case, evidence regarding the negotiations surrounding Schedule F and the proposed § 6.02(iv) indemnity clause was relevant to illuminate the parties' understanding of the particular contractual provisions Mark alleged Alan had breached and to determine whether the parties had contracted into a general tax indemnification obligation pursuant to the Purchase Agreement or otherwise. On this record, we find no error.

### III. Interpretation of the Purchase Agreement

**¶18** Mark argues the trial court erred in ignoring an interpretation of the Purchase Agreement that both parties ascribed to it after execution—in which Alan owed a duty to indemnify him for taxes owed in excess of estimated taxes projected within the Schedule F Purchase Price Allocation Schedule—and that he presented evidence Alan had breached numerous terms of the Purchase Agreement—specifically, §§ 2.05, 4.02, and 5.03, triggering indemnity obligations as provided in § 6.02.

**¶19** Mark's argument ignores that the parties ultimately agreed not to include the blanket indemnity clause, § 6.02(iv), that serves as the cornerstone of Mark's argument here, within the finalized Purchase Agreement; it being specifically removed from the draft document prior to execution, clearly indicating that neither Alan nor Mark interpreted the

Purchase Agreement as containing such a broad general tax indemnity clause. *See Polk v. Koerner*, 111 Ariz. 493, 495 (1975) ("It is a fundamental rule in the interpretation of contracts that the court must ascertain and give effect to the intention of the parties at the time the contract was made if at all possible." (citation omitted)). Further, we decline Mark's invitation to read the sections of the Purchase Agreement he cites in such an expansive fashion as to support the conclusion that Alan owed a duty to indemnify Mark for taxes owed in excess of the estimated taxes projected within the Schedule F Purchase Price Allocation Schedule, despite the specific exclusion of § 6.02(iv).[5]

¶20    Also, Mark relies for much of his indemnification argument upon his premise that he proved Alan breached numerous terms of the Purchase Agreement and the trial court erred in finding otherwise. In doing so, Mark in effect argues the trial court was required to believe his characterization of the evidence over Alan's, and essentially asks this court to reweigh the evidence.

¶21    However, when a matter is tried before the court and findings of fact and conclusions of law were neither made nor requested pursuant to Arizona Rule of Civil Procedure 52(a)(1), we interpret all reasonable inferences in favor of the appellee—in this case, Alan—and assume the trial court made all findings of fact necessary to support the court's judgment. *See Stautz v. Pence*, 21 Ariz. App. 153, 155 (1973); *Gardner v. Royal Dev. Co.*, 11 Ariz. App. 447, 449 (1970). Moreover, when evidence conflicts, as it does here, we defer to the trial court's determination of the witnesses' credibility and the weight to give such conflicting evidence. *Gutierrez v. Gutierrez*, 193 Ariz. 343, 347, ¶ 13 (App. 1998). Thus, we do not reweigh any conflicting evidence; instead, we examine the record only to determine whether substantial evidence exists to support the trial court. *In re Estate of Pouser*, 193 Ariz. 574, 579, ¶ 13 (1999) (citation omitted).

¶22    In this case, and interpreting all reasonable inferences in favor of Alan, as we must, we conclude that substantial evidence supports the trial court's ruling that Alan did not breach the Purchase Agreement.

---

[5]    We also disagree with Mark's suggestion that the trial court's finding that the Purchase Agreement did not create a general right of indemnification if his taxes exceeded the estimates set forth in the Schedule F Purchase Price Allocation Schedule rendered meaningless other provisions of the Purchase Agreement. Alan's limited contractual indemnification obligations were not eliminated by the trial court, and Alan never argued he was immune from any and all indemnity obligations.

Although § 2.05 required Alan (and Mark) to "file all tax returns consistently with the Purchase Price Allocation Schedule," it did not guarantee that all tax returns would exactly match the estimates provided for in Schedule F, and whether the tax returns and allocation of the purchase price were inconsistent with Schedule F—and whether Mark assented to the late appraisal from MCA supporting the allocation of values assigned to the Otto Companies—were questions of fact to be decided by the trial court. As for Mark's claim that Alan breached § 4.02, subsection (c) of that section expressly acknowledges the Purchase Price Allocation Schedule was prepared for the purpose of "estimating" Mark's taxes, and although it warrants that the schedule accurately sets forth the adjusted tax basis of Mark's interests as of June 30, 2012, and is "true and complete in all material respects," it does not guarantee that any estimate provided within that schedule could not change. Such is, in fact, the nature of "estimates." Whether a breach precipitated any change was a question driven by the competing facts, and upon this record, we cannot say the trial court erred in finding no breach. As for Mark's claim that Alan breached § 5.03, Mark points to no evidence identifying any related party transactions that negatively affected Mark's tax position or any non-standard market rate transactions that ultimately impacted Mark's taxes. Although Mark points to evidence—including Alan's remittance of the $200,000 for Mark's estimated 2012 taxes and statements from Alan's agents—from which a trier of fact might conclude Alan believed he had contractually guaranteed the tax projections in Schedule F and Mark was entitled to indemnification for any excess taxes, Alan presented substantial evidence and explanations from which a trier of fact also could have reasonably concluded that, viewed in context, Mark's interpretation was incorrect. Accordingly, we find no error.

¶23        The trial court also found Mark had failed to prove damages as a result of any alleged breach by Alan of the Purchase Agreement. Mark argues he provided sufficient proof of his damages, while Alan counters in part that Mark's expert witness on damages, Elizabeth Monty, failed to tie Mark's alleged damages to any alleged inaccuracy in Schedule F or any other alleged breach. Because the trial court found Alan did not breach the Purchase Agreement, and we discern no error related to that finding, there are no damages for which Alan can be liable where there is no breach. We note, however, that even were we to consider this argument, our scope of review would be limited by the parties' decision not to request findings of fact or conclusions of law.

IV.    *Promissory Estoppel*

**¶24**    Mark argues he proved his counterclaim for promissory estoppel, and the trial court erred in failing to find Alan was estopped from refusing to indemnify him and in ordering him to return the $200,000 to Alan.

**¶25**    "To prove promissory estoppel, a [plaintiff] must show that the [defendant] made a promise and should have reasonably foreseen that the [plaintiff] would rely on that promise and further that the [plaintiff] did in fact rely on that promise." *Double AA Builders, Ltd. v. Grand State Constr. L.L.C.*, 210 Ariz. 503, 507, ¶ 19 (App. 2005) (citations omitted). "The [plaintiff] must also show that he had a 'justifiable right to rely' on the promise." *Id.* (citation omitted).

**¶26**    For the same general reasons that the trial court did not err in finding Mark failed to prove a breach of any contractual provision requiring indemnification, the court also did not err in concluding Mark failed to prove the existence of any promise by Alan guaranteeing indemnification if Mark's actual taxes exceeded the estimates in Schedule F. Whether any statements by Alan's agents, payment of the $200,000, and the September 2013 letter accompanying the $200,000 payment constituted a promise, and whether Mark justifiably relied upon that alleged promise and changed his position to his detriment in reliance upon that promise as he claims, were contested issues of fact for the trial court to decide based in part upon witnesses' credibility. *See Gutierrez*, 193 Ariz. at 347, ¶ 13. Taking all reasonable inferences in favor of Alan, *see Stautz*, 21 Ariz. App. at 155, we conclude substantial evidence exists to support the trial court's determination, *see Estate of Pouser*, 193 Ariz. at 579, ¶ 13. Accordingly, the trial court did not err in declining to apply promissory estoppel and in ordering Mark to return the $200,000 to Alan.

V.    *Motion to Compel/Accountant-Client Privilege*

**¶27**    During discovery, Mark filed a motion to compel, seeking disclosure of work papers and communications Alan had withheld based upon the accountant-client privilege. Following full briefing and oral argument, the trial court ordered *in camera* review of the documents. After reviewing the documents *in camera*, the trial court held a telephonic status conference and denied the motion to compel, explaining as follows:

> **THE COURT FINDS** that the Accountant-Client privilege attaches to communications between Alan Otto and

others within Otto Trucking and Jim Raftery and others within his firm.

> **IT IS THEREFORE ORDERED** that the communications between Alan Otto and others within Otto Trucking and Jim Raftery and others within his firm, including those contained in Exhibit 6, are privileged. Plaintiffs, however, shall amend the privilege log and their document production by redacting all privileged communications from the documents in Exhibit 6 and producing the redacted versions. The privilege log also shall identify the documents that were attached to the emails in Exhibit 6.

> **THE COURT FURTHER FINDS** that effective September 14, 2015, the Accountant-Client privilege attaches to communications between MCA and Jim Raftery and others within his firm.

> **IT IS THEREFORE ORDERED** that the communications between MCA and Jim Raftery and others within his firm, including those contained in Exhibit 7, are privileged. Plaintiffs, however, shall amend the privilege log and their document production by redacting all privileged communications from the documents in Exhibit 7 and producing the redacted versions. The privilege log also shall identify the documents that were attached to the emails in Exhibit 7.

Alan later served Mark with revised privilege logs and redacted versions of the accountant-client privileged communications identified on Exhibits 6 and 7 of Mark's motion to compel.

¶28 Mark later moved for a protective order preventing Alan from deposing Mark's tax accountant, Hodges, or, in the alternative, limiting the scope of that deposition by precluding any questions that would elicit information: (1) protected by the accountant-client privilege, or (2) based on knowledge Hodges gained in his capacity as a consulting expert during the litigation. After briefing and further oral argument, the trial court took the matter under advisement and later further ordered as follows:

> **IT IS THEREFORE ORDERED** that at this time and based on the arguments presented, neither the Alan Otto

plaintiffs nor the Mark Otto defendants have waived the accountant-client privilege.

**IT IS FURTHER ORDERED** that the accountants James Rafferty [sic] and Mark Hodges and their associates are subject to depositions as fact witnesses about information that they received from the parties and about their communications with third parties, but Mr. Rafferty [sic] and Mr. Hodges and their associates are not subject to discovery regarding privileged communications with their clients, advice given to their clients, and about the accounting theories on which they relied in preparing the relevant documents.

**IT IS THEREFORE ORDERED** consistent with the court's rulings on the record and above, granting in part and denying in part the Mark Otto defendants' Motion for Protective Order (Docket # 70).

¶29 Without citing to the trial court's rulings, Mark argues the court erred in denying his motion to compel. He also suggests in a footnote that the court erred in conducting the *in camera* review, and states that the court's failure to consider recusal after conducting that review "potentially colored the outcome of the bench trial."

¶30 Arizona protects from discovery or disclosure in civil litigation client records or information that certified public accountants practicing in this state have received by reason of the confidential nature of their employment, including information derived from or as a result of such professional source. A.R.S. § 32-749(A). The accountant-client privilege extends "to communications between accountant and client when those communications pertain to the client's financial affairs," but "does not apply to communications received by the client from an accountant employed as an expert to examine the affairs of a non-client." *Brown v. Superior Court*, 137 Ariz. 327, 338 (1983).

¶31 In general, we review the trial court's discovery rulings for an abuse of discretion. *See Lund v. Myers*, 232 Ariz. 309, 312, ¶ 17 (2013) (citing *State Farm Mut. Auto. Ins. Co. v. Lee*, 199 Ariz. 52, 57, ¶ 12 (2000) (noting that discovery rulings relating to privilege are reviewed for an abuse of discretion)); *see also Romley v. Schneider*, 202 Ariz. 362, 363, ¶ 5 (App. 2002) (review a ruling on a motion to compel for an abuse of discretion).

**¶32**        In this case, although the proceedings were recorded, Mark has not provided transcripts of the oral arguments conducted upon the issue of the attorney-client privilege, and in the absence of such transcripts, we presume that whatever transpired at the hearings supported the court's decision to conduct the *in camera* review and its ultimate rulings that the documents were entitled to the protection of the accountant-client privilege. *See Johnson v. Elson*, 192 Ariz. 486, 489, ¶ 11 (App. 1998). The record provides no indication that Mark ever objected to the court's *in camera* review of the allegedly privileged documents, that Mark requested the court appoint a different judicial officer to conduct the *in camera* review in a Discovery Master capacity, or that Mark later moved for recusal of the judge, that the court was biased, or Mark was actually prejudiced by the court's *in camera* review. *See Lund*, 232 Ariz. at 312-13, ¶ 19. Accordingly, Mark may be deemed to have waived this argument, *see generally Andrew Brown Co. v. Painters Warehouse, Inc.*, 111 Ariz. 404, 407 (1975); *Ritchie v. Krasner*, 221 Ariz. 288, 303, ¶ 51 (App. 2009), and in any event, we cannot conclude the court abused its discretion in denying Mark's motion to compel.

*VI.        The Trial Court's Award of Attorneys' Fees*

**¶33**        Citing *American Power Products, Inc. v. CSK Auto, Inc.*, 242 Ariz. 364 (2017), Mark argues the trial court erred in awarding attorneys' fees to Alan under A.R.S. § 12-341.01.[6] Mark reasons that because Article VI, § 6.01, of the Purchase Agreement provides for fee indemnification in a circumstance different than the one presented in this case, and the Purchase Agreement otherwise contains no general fee provision, the trial court's award pursuant to A.R.S. § 12-341.01 necessarily conflicts with the parties' agreement.[7]

**¶34**        Absent an abuse of discretion, we generally will uphold a trial court's determination of which party is successful and thus entitled to a fee award. *Am. Power*, 242 Ariz. at 367, ¶ 12. However, we review *de novo* issues of contract interpretation and statutory application. *Id.*

**¶35**        Mark's argument misconstrues our supreme court's holding in *American Power*, which upheld "the general rule in Arizona that contracts

---

[6]        Mark had also sought attorneys' fees pursuant to A.R.S. § 12-341.01.

[7]        Mark does not argue the factors cited in *Associated Indemnity Corp. v. Warner*, 143 Ariz. 567, 570 (1985), do not weigh in favor of an award of fees or that the hours or billable rates of Alan's counsel were unreasonable.

are read to incorporate applicable statutes." *Id.* at 368, ¶ 15 (citation omitted). In *American Power*, our supreme court held that, "[t]o the extent prior case law broadly precludes application of § 12-341.01 whenever the parties' contract contains an attorney fee provision, regardless of its content, scope, and other provisions in the contract, we disagree." *Id.* at ¶ 14. The court noted that an award under § 12-341.01 is precluded only to the extent that statute "effectively conflicts with an express contractual provision governing recovery of attorney's fees." *Id.* (quoting *Jordan v. Burgbacher*, 180 Ariz. 221, 229 (App. 1994)). "Thus, rather than being completely supplanted by any attorney fee provision in the parties' contract, the statute—consistent with its plain language—applies to 'any contested action arising out of contract' to the extent it does not conflict with the contract." *Id.* (quoting A.R.S. § 12-341.01(A)).

¶36        In this case, as the trial court correctly concluded, the indemnification provisions in Article VI of the Purchase Agreement do not conflict with the court's award of attorneys' fees pursuant to A.R.S. § 12-341.01. Moreover, Article VII, § 7.07, of the Purchase Agreement, which states that Arizona law governs the parties' agreement, effectively incorporates § 12-341.01, at least to the extent it does not directly conflict with the Purchase Agreement. Thus, § 12-341.01 may be construed as supplementing Article VI.

¶37        Because nothing in Article VI, § 6.01, conflicts with an award of fees pursuant to A.R.S. § 12-341.01, the trial court did not err in awarding attorneys' fees under A.R.S. § 12-341.01.

        VII.    *Attorneys' Fees on Appeal*

¶38        Citing Arizona Rule of Civil Appellate Procedure ("ARCAP") 21(a) and "the parties' written agreements," Mark requests attorneys' fees on appeal. Neither of these references provides a substantive basis for the request. *See* ARCAP 21(a)(2). Moreover, Mark is not the prevailing party on appeal. Alan, the prevailing party, has not requested attorneys' fees on appeal. Accordingly, none are awarded. We award Alan his taxable costs on appeal upon compliance with ARCAP 21.

**CONCLUSION**

¶39        The trial court's judgment is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:   AA